[Until this opinion appears in the Ohio Official Reports advance sheets, it may be cited as *State v. Cepec,* Slip Opinion No. 2016-Ohio-8076.]

NOTICE

This slip opinion is subject to formal revision before it is published in an advance sheet of the Ohio Official Reports.  Readers are requested to promptly notify the Reporter of Decisions, Supreme Court of Ohio, 65 South Front Street, Columbus, Ohio 43215, of any typographical or other formal errors in the opinion, in order that corrections may be made before the opinion is published.

SLIP OPINION NO. 2016-OHIO-8076

THE STATE OF OHIO, APPELLEE, *v*. CEPEC, APPELLANT.

[Until this opinion appears in the Ohio Official Reports advance sheets, it may be cited as *State v. Cepec,* Slip Opinion No. 2016-Ohio-8076.]

*Criminal Law—Aggravated murder—Death penalty—Conviction and death penalty affirmed.*

(No. 2013-0915—Submitted July 13, 2016—Decided December 13, 2016.)

APPEAL from the Court of Common Pleas of Medina County, No. 10-CR-0588

_____

**O'CONNOR, C.J.**

{¶ 1} This is an appeal as of right from an aggravated-murder conviction and death sentence.  A Medina County jury convicted appellant, Steven E. Cepec, of the aggravated murder of Frank Munz, as well as other offenses, and unanimously recommended a sentence of death.  The trial court accepted the recommendation and sentenced Cepec accordingly.

{¶ 2} We affirm Cepec's convictions and sentence.

## RELEVANT BACKGROUND

{¶ 3} The state called 37 witnesses to testify at trial. The defense did not present any witnesses during the trial phase. The evidence that follows was presented to the jury.

*The Evidence at Trial*

### *Events leading to Munz's murder*

{¶ 4} In May 2010, a hearing officer for the Ohio Adult Parole Authority ordered Cepec to complete a halfway-house drug-treatment program as a sanction for his parole violation. On May 28, the day he was admitted to the program after transfer from the Lorain Correctional Institution, he left to go to the hospital and did not return. He was declared absent without leave just after midnight on May 29, and a warrant was issued for his arrest.

{¶ 5} During the next few days, Cepec and his girlfriend, Michelle Palmer, stayed with various acquaintances in Cleveland and in a recreational vehicle in a barn in Medina County owned by Palmer's father. The barn is located near the residence of Frank Munz and his nephew, Paul Munz.

{¶ 6} Cepec had been to the Munz house several times to make phone calls. At least once after Cepec left the halfway house, Paul had heard Cepec phoning people from Frank's telephone, asking for money.

{¶ 7} On June 3, Palmer's sister, Renee, and her family delivered Cepec to the barn in Medina at noon, while Palmer went to Parma to see her children. Before the trip, Cepec had borrowed two or three dollars and a pair of shoes from Renee's boyfriend. At Cepec's request, Sarah Styverson visited the barn with two others around 1:30 p.m., when Cepec asked them to drive him to Medina. They spoke with him for about ten minutes but refused to drive him to town.

### *9-1-1 call and arrest*

{¶ 8} About an hour later, Paul heard Frank and Cepec talking in the Munz house and then heard "two loud thumps." Paul heard Frank shout, "Cut it out,

2

asshole." Paul next heard someone "choking, then silence, and then someone panting pretty heavily." Paul locked himself in a bedroom. He heard footsteps in the hall and around the other bedrooms. He also heard someone running the bathroom faucet and "dumping tin cans full of change out." When he heard someone try to open his door, he called 9-1-1. In the 9-1-1 recording, Paul described what he had heard and identified Cepec as the person talking to his uncle.

{¶ 9} At 2:37 p.m., the Medina County Sheriff's Office dispatched officers to the Munz house for a burglary in progress. Deputy Steven Herte saw Cepec in the garage. Herte ordered him to "get down on the ground." Cepec acted as though he would comply, but instead took off through the woods. Officers found him in the brush in a nearby field and arrested him.

### The investigation

{¶ 10} Upon entering the house, officers discovered Frank lying face down on the kitchen floor with major head trauma. He was not wearing a shirt. The only other occupant was Paul, who was in the locked bedroom.

{¶ 11} Bureau of Criminal Investigation ("BCI") Agent Mark Kollar testified that the center of the kitchen floor was saturated with blood and that there was blood spatter throughout the room. Based on the blood spatter, he determined that the victim had received more than one blow and that at least three to seven minutes had elapsed between an initial and subsequent impact.

{¶ 12} Kollar discovered four empty coffee cans in one bedroom, with loose change scattered nearby, and a sleeping bag that appeared to have been removed from its storage bag in another bedroom. A storage bag was located near the front door.

{¶ 13} In the living room, a lamp with its cord either cut off or ripped out was lying on the floor, and a number of bags were on the floor near the front door. Two bags contained change with a combined value of over $300. What looked like a sleeping-bag storage sack contained a BB gun, a blood-stained claw hammer, a

blood-stained black t-shirt, blood-soaked socks, a bloody lamp cord, a partial roll of duct tape, duct tape that was fashioned in a circle, a white shirt torn down the back, chewing gum, a dime, and an assortment of wet, bloody towels and washcloths.

{¶ 14} BCI tested the bags and their contents for the presence of blood. Also tested were the blue jeans and borrowed shoes that Cepec had been wearing when he was arrested. Lynda Eveleth, a forensic scientist at BCI, testified that DNA testing established that the blood on the electric cord, bag, claw hammer, coffee can, and duct tape all was consistent with Frank's DNA. The white shirt also contained blood DNA from Frank.

{¶ 15} A cutting from the black t-shirt in the bag contained DNA from both Frank and Cepec and an additional individual. Cepec's blue jeans and shoes also contained blood from Frank and another individual. Eveleth determined that Paul's DNA was not consistent with the DNA on any of the items tested.

{¶ 16} Frank's autopsy revealed multiple skull fractures and brain injuries. Dr. Andrea McCollom, the deputy medical examiner who conducted the autopsy, testified that the lacerations and fractures were consistent with impacts from and removal of the dual prongs of a claw hammer. She also indicated that Frank had an eight-inch furrow across the front of his neck, with an associated fracture of the thyroid cartilage.

{¶ 17} She identified two independent causes of death: "Blunt impact to head, trunk, and extremity with skeletal and brain injuries" and "asphyxia by strangulation." Either was sufficient to result in death, and Frank was alive when each injury occurred.

{¶ 18} Curtiss Jones, supervisor of the Cuyahoga County Medical Examiner's Office trace-evidence department, identified duct-tape residue on Frank's wrists and watch that was consistent with his wrists being bound with duct tape.

4

{¶ 19} The morning after the murder, James Bradley, then a patrol officer with the Spencer police department, inspected the cruiser in which Cepec had been temporarily placed after his arrest. Bradley discovered a set of keys under the driver's seat. A second set of keys was found in the same cruiser the following day, during a more detailed inspection. Detective J. Tadd Davis of the Medina County Sheriff's Office determined that the first set of keys fit the Munz home's garage door and Frank's Saturn. The second set included keys for Frank's Saturn, S-10 pickup truck, and white van, as well as a door into the Munz house.

### Cepec's statements

{¶ 20} During the course of his arrest and the subsequent investigation, Cepec made a number of statements to law enforcement.

{¶ 21} On June 3, after Cepec's arrest and while he was detained in the police cruiser, Cepec made spontaneous statements to a detective that he "didn't do it." After a detective read Cepec his *Miranda* rights from a form and informed Cepec that there was a witness, he repeated, "I didn't do it. Paul did it."

{¶ 22} Later that night in a Medina County sheriff's department interview room, Detective Davis reread Cepec his *Miranda* rights. Cepec continued to deny any involvement. Specifically, Cepec maintained that he had entered the house and found Frank already on the floor, bleeding.

{¶ 23} On June 4, Cepec asked to speak with Detective Davis again. During that meeting, Detective Davis again read Cepec his *Miranda* rights. After he did so, Cepec confessed that he had burglarized the Munz residence and had killed Frank while robbing him.

{¶ 24} Cepec also claimed that Palmer had planned the crime and had convinced him to do it. He said that he had intended only to rob Frank, but that he and Frank had struggled after Frank broke free from the duct tape, and Cepec ended up hitting Frank with a hammer and wrapping a lamp cord around his neck Cepec also described changing into a shirt he had found in a bedroom and placing his

bloody shirt in one of the bags, removing his socks and using them like gloves while he burglarized the house, and discarding Frank's keys, which he had removed from Frank's pockets, under the driver's seat of the police cruiser.

{¶ 25} On June 9, Cepec again requested to speak with Detective Davis. During that interview, which was conducted in a holding cell while Cepec awaited transfer to a correctional facility, Detective Davis again advised Cepec of his *Miranda* rights. Cepec stated that Palmer had been present for the robbery and that she had hit Frank with the hammer once, but that he had struck the remaining blows.

{¶ 26} Over the following days and months, Cepec made additional statements about the case. Some of these statements were made while under the care of medical personnel and guarded by sheriff's deputies, and others were made while he was being transported to meetings related to his murder case.

*Procedural history*

### *Trial*

{¶ 27} The state charged Cepec with four counts of aggravated murder. The first count was aggravated murder with prior calculation and design, R.C. 2903.01(A), and the remaining counts were aggravated murder in the course of aggravated robbery, kidnapping, and aggravated burglary, R.C. 2903.01(B).

{¶ 28} Each of the counts included four identical capital specifications for murder committed in the course of aggravated robbery, kidnapping, and aggravated burglary, R.C. 2929.04(A)(7), and for murder committed while under detention or at large after breaking detention, 2929.04(A)(4).

{¶ 29} Cepec was also charged with murder, felony murder, aggravated robbery, and aggravated burglary. The aggravated-robbery and aggravated-burglary charges included a repeat-violent-offender specification.

{¶ 30} Cepec pleaded not guilty and invoked his right to a jury trial on all the charges except the two repeat-violent-offender specifications. Prior to trial, the

6

court held a hearing on Cepec's motion to suppress certain statements to police. The court denied the motion, and the statements were admitted at trial.

{¶ 31} The jury found Cepec not guilty of the first count (aggravated murder with prior calculation and design), but guilty of the other aggravated-murder counts as well as the remaining charges and specifications. The parties stipulated to Cepec's prior aggravated-burglary convictions, and the court determined that he was a repeat violent offender.

### Sentencing

{¶ 32} The trial court merged all the murder convictions into a single count of aggravated murder while committing aggravated robbery. After hearing evidence on the aggravating circumstances, the jury recommended a death sentence on the aggravated-murder conviction. After its independent weighing, the court found that the aggravating circumstances outweighed the mitigating factors and sentenced Cepec to death for aggravated murder and ten years for the aggravated-burglary conviction and the repeat-violent-offender specification, the prison sentences to be served consecutively.

### ANALYSIS

{¶ 33} Cepec appeals his convictions and sentence through seven propositions of law.

### Pretrial Issues

### Suppression of statements to police

{¶ 34} In his third proposition of law, Cepec challenges the admissibility of statements that he made during his interview with detectives on June 3 after he requested counsel regarding the use of a chemical test to detect the presence of blood.

{¶ 35} The Fifth and Fourteenth Amendments require that a person be notified of his or her right to remain silent and the right to the presence of an attorney prior to a custodial interrogation. *Miranda v. Arizona*, 384 U.S. 436, 471,

86 S.Ct. 1602, 16 L.Ed.2d 694 (1966). "Where a suspect speaks freely to police *after* acknowledging that he understands his rights, a court may infer that the suspect implicitly waived his rights." (Emphasis sic.) *State v. Murphy*, 91 Ohio St.3d 516, 519, 747 N.E.2d 765 (2001). "The determination of whether there has been an intelligent waiver of [the] right to counsel must depend, in each case, upon the particular facts and circumstances surrounding that case, including the background, experience, and conduct of the accused." *Johnson v. Zerbst*, 304 U.S. 458, 464, 58 S.Ct. 1019, 82 L.Ed. 1461 (1938).

{¶ 36} An initial waiver of *Miranda* rights can be revoked. "[A]fter a knowing and voluntary waiver of the *Miranda* rights, law enforcement officers may continue questioning until and unless the suspect clearly requests an attorney." *Davis v. United States*, 512 U.S. 452, 461, 114 S.Ct. 2350, 129 L.Ed.2d 362 (1994). "If the individual states that he wants an attorney, the interrogation must cease until an attorney is present." *Miranda* at 474.

{¶ 37} To invoke the right to counsel, the suspect must make an unequivocal request. The person "must articulate his desire to have counsel present sufficiently clearly that a reasonable police officer in the circumstances would understand the statement to be a request for an attorney." *Davis* at 459. "[T]his is an objective inquiry." *Id*. Courts are required to "examine [the] appellant's words not in isolation but in context." *Murphy* at 520-521.

{¶ 38} Here, Cepec does not dispute that detectives Mirandized him prior to the June 3 interview. Cepec verbally acknowledged his right to remain silent and nodded his head in response to each of the other rights before being questioned. Cepec asserts that although he requested counsel once during the interview, the interview continued without honoring his request.

{¶ 39} During questioning on June 3, Cepec denied any involvement in Frank's injuries and said repeatedly that Frank was already lying on the floor bleeding when Cepec entered the house to use Frank's phone. In the course of the

interview, he stated, "That's it, you can test my hands—you can even spray my hands you can—the only blood you're gonna find on me is my shoes and my pants."

{¶ 40} Later in the interview, Detective Samo Mernik asked Detective Davis to get his Luminol light to check Cepec's hands for blood. According to Detective Davis's testimony during the suppression hearing, Luminol is a chemical process and alternative light source that can be used to detect the presence of small amounts of blood. Detective Davis was "trained that you should not use it on humans" because "[i]t's a toxic chemical."

{¶ 41} While Detective Davis was out of the interview room, Cepec asked about the light. Detective Mernik explained its general function, after which the following exchange occurred:

> Cepec: "Well, before you use it, can I have a lawyer here?"
>
> Mernik: "No, I don't think we need one for that. If you didn't do nothing, why do you need a lawyer?"

{¶ 42} Cepec's interview continued for several hours after this exchange, during which time he continued to deny involvement in Frank's death. The Luminol test was never brought into the interview room. Cepec was told that it was unavailable because it was being used at the scene. Detective Davis later testified that the discussion of Luminol was an interview technique prompted by Cepec's offer to let them spray his hands—Luminol was not actually intended to be used on him because it is not safe for human use.

{¶ 43} Cepec asserts that his question about having a lawyer present for the Luminol test was a clear and unequivocal request for counsel that revoked his previous waiver and triggered his right to counsel. Thus, Cepec contends, his statements after that request should have been suppressed.

**{¶ 44}** Viewed in context, Cepec requested counsel for a particular, identified circumstance. Namely, Cepec asked whether he could have an attorney present before the Luminol test would be administered.

**{¶ 45}** The United States Supreme Court has ruled that a suspect's unambiguous request for counsel for a limited purpose need not be interpreted as a request for counsel for all purposes. *Connecticut v. Barrett*, 479 U.S. 523, 530, 107 S.Ct. 828, 93 L.Ed.2d 920 (1987). In *Barrett*, a suspect requested counsel in order to make a written statement, but agreed to speak with police verbally without counsel present. The court held that the resulting verbal confession was admissible, because it was clear that the suspect requested counsel only for the specific purpose of making a written statement. *Id.* at 529. Although a request for counsel generally will be broadly interpreted, "[i]nterpretation is only required where the defendant's words, understood as ordinary people would understand them, are ambiguous." *Id.* "To conclude that [the suspect] invoked his right to counsel for all purposes requires not a broad interpretation of an ambiguous statement, but a disregard of the ordinary meaning of [his] statement." *Id.* at 529-530.

**{¶ 46}** Here, an ordinary person would understand Cepec's question— "Well, before you use it, can I have a lawyer here?"—to unambiguously refer to having counsel present for the Luminol test. It was not a general request for counsel. Cepec had not asked for counsel up until that point and then asked for counsel only in the context of an exchange with the detective regarding the function of the Luminol test. And the Luminol test was never actually administered. When no test was performed, Cepec continued to speak to detectives without counsel and to deny his involvement in Frank's death. Thus, when Cepec's request is considered in the context of the exchange, we conclude that Cepec did not unequivocally invoke his right to counsel for all purposes of the interview.

**{¶ 47}** Even if we were to find the admission of Cepec's June 3 interview statements improper, the error would be harmless beyond a reasonable doubt. If

the interview statements had been suppressed, the remaining evidence, standing alone, would constitute overwhelming evidence of guilt. *See State v. Williams*, 6 Ohio St.3d 281, 290, 452 N.E.2d 1323 (1983).

{¶ 48} In addition to the overwhelming other evidence of Cepec's guilt discussed herein, Cepec's Fifth Amendment argument was limited to the June 3 interview. But during that interview, Cepec denied involvement in Frank's murder. On June 4, Cepec initiated further communication with Detective Davis and made inculpatory statements confessing to the killing after the detective administered *Miranda* warnings. A suspect's invocation of his or her rights under *Miranda* does not proscribe for an indefinite duration any further questioning. *Michigan v. Mosley*, 423 U.S. 96, 102, 96 S.Ct. 321, 46 L.Ed.2d 313 (1975). And there is no indication in Cepec's arguments that he is objecting to the propriety of the June 4 interview without counsel.

{¶ 49} We therefore reject Cepec's third proposition of law.

### Ineffective assistance of counsel during voir dire

{¶ 50} In his fourth proposition of law, Cepec claims that he received ineffective assistance of counsel in several ways. We address each argument in relation to the relevant portion of the proceedings.

{¶ 51} To demonstrate that counsel provided ineffective assistance, Cepec first

> must show that counsel's performance was deficient[—]* * * that counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment. Second, the defendant must show that the deficient performance prejudiced the defense. This requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable.

*Strickland v. Washington*, 466 U.S. 668, 687, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984).

**{¶ 52}** Scrutiny of counsel's performance is highly deferential. We "must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." *Id.* at 689. We will "not second-guess trial strategy decisions." *State v. Mason*, 82 Ohio St.3d 144, 157, 694 N.E.2d 932 (1998).

*Aryan Brotherhood tattoo*

**{¶ 53}** Cepec alleges that he received ineffective assistance because, during the voir dire of Juror 213, his counsel mentioned Cepec's Aryan Brotherhood ties.

**{¶ 54}** Juror 213 was the only African-American in the venire who was potentially willing to impose a death sentence, based on her responses to the death-penalty questionnaire. During voir dire, Cepec's counsel asked whether the group "Aryan Brotherhood" meant anything to her. She identified it as a group of white supremacists who believe that they are superior to all minorities. Then counsel inquired, "If at some point in time evidence in this case were to suggest that our client has tattoos indicating that he's a member of the Aryan Brotherhood and knowing from your own personal experience what that organization stands for, what reaction do you have to that?" In response, Juror 213 stated:

> There's people that I don't like. Not being funny, there's white people I don't like. If he doesn't like black people, that's his personal opinion. There's nothing I can say or do about that. All I can do is carry myself to the best of my ability. There's white people that I don't like. That doesn't mean I'm part of a gang going around killing white people.

> It's just his opinion. I don't have to be bothered with it. It doesn't have to be around me. In fact, my great grandmother's German. So to me, it's a whole bunch of—it's your choice, your opinion, your thought.

**{¶ 55}** Defense counsel then asked what she would do if her personal prejudices conflicted with the judge's instructions. She responded, "Well, that's where I try to be a grown up and I still go about the facts that are set in front of me and, you know, that's just, as adults, what we're supposed to do."

**{¶ 56}** The prosecution attempted to dismiss Juror 213 using a peremptory challenge, and Cepec's counsel objected on *Batson* grounds. *Batson v. Kentucky,* 476 U.S. 79, 89, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986) prohibits a peremptory challenge from being used "to challenge potential jurors solely on account of their race." The prosecution opposed the *Batson* challenge, arguing that Cepec's counsel raised the Aryan Brotherhood tattoo "to create an issue on appeal." The court acknowledged that there was an appellate issue either way and sustained the *Batson* challenge. Juror 213 sat on the jury.

**{¶ 57}** Cepec now argues that his trial counsel were ineffective because they "poisoned" Juror 213 against him by discussing his Aryan Brotherhood ties. He claims that "the raising of non-issues that could cause juror prejudice is deficient."

**{¶ 58}** However, "counsel is in the best position to determine whether any potential juror should be questioned and to what extent." *Murphy*, 91 Ohio St.3d at 539, 747 N.E.2d 765. "This court will normally defer to defense counsel's judgment in voir dire and not find ineffective assistance." *State v. Jackson*, 107 Ohio St.3d 300, 2006-Ohio-1, 839 N.E.2d 362, ¶ 128. And the "decision to voir dire on racial prejudice is a choice best left to a capital defendant's counsel." *State v. Smith*, 89 Ohio St.3d 323, 327, 731 N.E.2d 645 (2000), citing *Turner v. Murray,* 476 U.S. 28, 37, 106 S.Ct. 1683, 90 L.Ed.2d 27 (1986).

**{¶ 59}** Here, there was a possibility that the jurors would see Cepec's tattoo during trial. During Cepec's videotaped interviews with police, he was photographed without his shirt, revealing his tattoo. Additionally, the state could have introduced prison records that documented the tattoo. Considering both the deference with which we must consider questions asked during voir dire and the possibility that the jury might see Cepec's tattoo, the decision to ask Juror 213 about the organization does not demonstrate deficient performance by Cepec's counsel.

**{¶ 60}** Moreover, even if counsel's questioning could be considered deficient, Cepec has not shown that it was prejudicial. "When a defendant bases an ineffective-assistance claim on an assertion that his counsel allowed the impanelment of a biased juror, the defendant '*must* show that the juror was *actually biased* against him.' " (Emphasis added in *Mundt*.) *State v. Mundt*, 115 Ohio St.3d 22, 2007-Ohio-4836, 873 N.E.2d 828, ¶ 67, quoting *Miller v. Francis,* 269 F.3d 609, 616 (6th Cir. 2001). Juror 213 stated that she could fairly consider the facts of the case, and we find nothing in the juror's statements during voir dire or anything else in the record indicating actual bias.

*Insufficient questioning*

**{¶ 61}** Cepec also argues that his attorneys were ineffective because they "failed to perform any major questioning" of jurors regarding "factors that could help them support a sentence of life imprisonment instead of a death sentence."

**{¶ 62}** However, he "does not identify a question that his attorneys should have asked but did not, a question that they did ask but should not have, or a specific objection that they failed to raise." *State v. Kirkland*, 140 Ohio St.3d 73, 2014-Ohio-1966, 15 N.E.3d 818, ¶ 100. Without such specifics, there is no basis on which to conclude that defense counsel's performance was deficient or prejudicial.

*Trial-phase issues*

### Competency of Paul Munz

{¶ 63} Cepec's first proposition of law argues that the trial court erred by failing to hold a hearing to determine Paul Munz's competency to testify.

*Competency question during trial*

{¶ 64} During trial, the prosecution asked Paul how he was able to identify Cepec's voice and whether his voice stood out in any way. The defense objected to the question without stating the specific grounds for the objection, but Paul answered before the judge could rule. The court then held a sidebar conference in which the following exchange occurred:

> The Court: "Is there a reason why—is this witness developmentally challenged?"
>
> [Assistant Prosecutor]: "We don't know, do we?"
>
> [Prosecutor]: "No. I don't know that, Judge. He's different, but I don't know that he's developmentally challenged."
>
> The Court: "All right."

{¶ 65} The court then admonished the prosecution not to lead its witness and stated that the prior question had been leading. Although Cepec, through counsel, objected to the leading question, he never asserted that Paul was incompetent to testify or inquired about Paul's competency until this appeal.

*Determination of witness competency*

{¶ 66} Evid.R. 601 specifies that "[e]very person is competent to be a witness except: (A) [t]hose of unsound mind, and children under ten years of age, who appear incapable of receiving just impressions of the facts and transactions respecting which they are examined, or of relating them truly * * *." If the witness

is of unsound mind or under the age of ten, the proponent of the witness bears the burden to establish certain indicia of competency. *State v. Clark*, 71 Ohio St.3d 466, 469, 644 N.E.2d 331 (1994).

**{¶ 67}** Although the standard of review for a competency evaluation is usually abuse of discretion, Cepec has forfeited all but plain error because he did not object to Paul's competency at trial. *State v. Slagle*, 65 Ohio St.3d 597, 604, 605 N.E.2d 916 (1992). Plain error is an obvious defect in the trial proceeding that affects substantial rights. *State v. Barnes,* 94 Ohio St.3d 21, 27, 759 N.E.2d 1240 (2002). The alleged error must have "substantially affected the outcome of the trial," *Slagle* at 605, such that "but for the error, the outcome of the trial clearly would have been otherwise," *State v. Long,* 53 Ohio St.2d 91, 372 N.E.2d 804 (1978) paragraph two of the syllabus; *accord State v. Jackson*, 141 Ohio St.3d 171, 2014-Ohio-3707, 23 N.E.3d 1023, ¶ 137.

**{¶ 68}** Other than the judge's question at sidebar in response to Paul's failure to wait for the judge to rule on an objection before answering the question, the issue of Paul's competency was never raised at trial. And on appeal, Cepec articulates no basis for questioning Paul's competency and identifies no obvious defect that affected his substantial rights. Based on our review of the record, we conclude that Cepec fails to demonstrate that the trial court committed plain error by failing to inquire into Paul's competency. We reject Cepec's first proposition of law.

**Interjections by the trial court judge**

**{¶ 69}** We address Cepec's second and sixth propositions of law together because they arise from the same circumstances. In his sixth proposition of law, Cepec alleges that the trial judge was biased against him and that the judge's interjections denied him a fair trial because they elicited prejudicial information that was not otherwise before the jury. In his second proposition of law, Cepec

claims that the trial judge erred by refusing to grant a mistrial for biased interjections.

*Authority of judge to question witnesses*

**{¶ 70}** The Ohio Rules of Evidence authorize a judge to question witnesses. "The court may interrogate witnesses, in an impartial manner, whether called by itself or by a party." Evid.R. 614(B). If a party believes the questioning inappropriate, the party may object "at the time or at the next available opportunity when the jury is not present." Evid.R. 614(C).

**{¶ 71}** Cepec cites numerous examples in both the trial and the mitigation transcripts in which the trial judge questioned a witness, sometimes interrupting counsel's questions to pose his own. Cepec did not object to these interjections at trial.

*Test for judicial bias based on trial interjections*

**{¶ 72}** We have previously explained the limits of judge questioning in a jury trial:

> In a trial before a jury, the court's participation by questioning or comment must be scrupulously limited, lest the court, consciously or unconsciously, indicate to the jury its opinion on the evidence or on the credibility of a witness.

*State ex rel. Wise v. Chand*, 21 Ohio St.2d 113, 256 N.E.2d 613 (1970), paragraph three of the syllabus.

**{¶ 73}** "[A] criminal trial before a biased judge is fundamentally unfair and denies a defendant due process of law." *State v. LaMar*, 95 Ohio St.3d 181, 2002-Ohio-2128, 767 N.E.2d 166, ¶ 34. The term "biased" "implies a hostile feeling or spirit of ill will or undue friendship or favoritism toward one of the litigants or his attorney, with the formation of a fixed anticipatory judgment on the part of the

judge, as contradistinguished from an open state of mind which will be governed by the law and the facts." *State ex rel. Pratt v. Weygandt*, 164 Ohio St. 463, 132 N.E.2d 191 (1956), paragraph four of the syllabus. The presence of a biased judge is structural error, which, if demonstrated, requires reversal. *State v. Sanders*, 92 Ohio St.3d 245, 278, 750 N.E.2d 90 (2001).

*Bias determination—trial phase*

{¶ 74} We find no evidence of judicial bias in the trial judge's interjections during trial. "[T]he threshold inquiry is whether, with reference to a range of acceptable, though not necessarily model, judicial behavior, the [trial] court's conduct falls demonstrably outside this range so as to constitute hostility or bias." *McMillan v. Castro*, 405 F.3d 405, 410 (6th Cir.2005).

{¶ 75} The majority of the judge's questions focused on complex evidentiary issues such as transfer DNA, the longevity of trace evidence, and the process for DNA replication. He also asked clarifying questions to determine which photographs were being referenced and whether the jury was able to see the photographs. These questions were phrased in a professional and unbiased manner.

{¶ 76} In one circumstance, the judge interrupted defense cross-examination to prohibit a witness from answering a question about whether the front door to the Munz house had been open when officers arrived on the scene. Although the judge could have waited for the prosecution to object, the testimony he prevented would likely have been inadmissible hearsay because the witness had not been present when the officers arrived and did not have firsthand knowledge to answer. The judge's interjection was not phrased in a hostile manner, nor did it otherwise suggest bias. And even if the judge's tone had been questionable on that particular exchange, less-than-model behavior will not rise to the level of bias unless it " 'permeated the trial.' " *Id*. at 412, quoting *United States v. Hickman*, 592 F.2d 931, 934 (1979). This single instance did not permeate the trial.

{¶ 77} Finally, even if a juror had thought that the judge might have indicated which side he favored, the judge properly instructed the jurors to ignore any such indication. "A jury is presumed to follow the instructions, including curative instructions, given it by a trial judge." *State v. Garner*, 74 Ohio St.3d 49, 59, 656 N.E.2d 623 (1995). Thus, the record fails to support Cepec's claim of bias in the judge's questioning during trial.

*Bias determination—mitigation phase*

{¶ 78} We also find no evidence of judicial bias with respect to the trial judge's interjections during the mitigation phase. During the mitigation phase, the trial judge interrupted both sides a similar number of times, and he asked questions of a variety of witnesses. Some of the questions attempted to clarify the definition of various psychological terms. Other questions elicited testimony that could be considered detrimental to Cepec, including his prior criminal history and hearsay evidence of mental illness.

{¶ 79} During the testimony of Jeff Taraschke, Cepec's parole officer, the judge asked him about Cepec's mental-health issues. Taraschke's response was composed of hearsay, based on what he had been told by Cepec's mental-health professionals. And a question about Cepec's history of self-injury while incarcerated elicited testimony that Cepec had been released from confinement after self-injuring while awaiting a parole-violation hearing so that the parole authority would not be required to pay his medical bills. Taraschke said, "[I]t's my belief that he had learned that if he injured himself while in custody, the State wouldn't want to pay for his medical expenses and we would release him from custody, because we had done that on two prior occasions."

{¶ 80} Another exchange with Taraschke prompted defense counsel to request a mistrial. The prosecution asked Taraschke, "[D]id you ever see any indication with respect to Steve Cepec that he would be committing a murder?" After Cepec's counsel objected, the judge rephrased the question to ask, "Do you

have an opinion based on a reasonable degree of professional certainty as a parole officer whether or not, prior to June 3rd, Mr. Cepec was capable of the offense of murder?" When responding, Taraschke mentioned Cepec's prior convictions, stating that Cepec had committed aggravated burglary on multiple occasions and that "[i]t was always the same pattern of daytime burglaries." Defense counsel moved for a mistrial, and the judge denied the motion. The judge then instructed the jury to disregard the testimony about Cepec's other offenses.

**{¶ 81}** Because the judge made the inquiry, there was a risk of the appearance of bias. *See Chand*, 21 Ohio St.2d 113, 256 N.E.2d 613, at paragraph three of the syllabus. However, " '[i]n absence of any showing of bias, prejudice, or prodding of a witness to elicit partisan testimony, it will be presumed that the trial court acted with impartiality.' " *State v. Baston*, 85 Ohio St.3d 418, 426, 709 N.E.2d 128 (1999), quoting *Jenkins v. Clark*, 7 Ohio App.3d 93, 98, 454 N.E.2d 541 (2d Dist.1982).

**{¶ 82}** With each of these exchanges, there is no indication in the record that the judge had a biased or unprofessional tone. Although his questions may have elicited unfavorable testimony, Cepec did not allege that the judge's demeanor was hostile. While the judge asked a number of questions, he did not appear to be badgering the witnesses; the questions typically built off one another, often serving to clarify previously offered testimony. And the judge interrupted both the prosecution and the defense, thereby reducing the appearance of bias.

**{¶ 83}** Because the overall tone of the judge's questions did not demonstrate bias or constitute the prodding of a witness, we find no structural error.

*Judge's questioning as unwarranted intervention*

**{¶ 84}** Although Cepec fails to show that the judge's questions demonstrated bias, the judge's questioning could still be improper if it "cross[ed] the line from helpful clarification to unwarranted intervention." *Baston,* 85 Ohio St.3d at 426, 709 N.E.2d 128. Because he failed to object, however, Cepec waived

all but plain error regarding the appropriateness of the judge's questioning. *Slagle*, 65 Ohio St.3d at 605, 605 N.E.2d 916.

{¶ 85} The judge's questioning does not rise to the level of plain error. The questioning "consisted mostly of attempts to clarify the witnesses' testimony, as is contemplated by the rule." *Baston* at 426.

{¶ 86} We therefore reject Cepec's sixth proposition of law.

### *Denial of mistrial*

{¶ 87} Cepec's counsel sought a mistrial during the mitigation phase after the judge's questioning prompted Officer Taraschke's testimony about Cepec's prior aggravated-burglary convictions.

{¶ 88} Before trial, Cepec filed a motion in limine to prohibit any mention of his prior felony convictions. The judge stated that he would wait to rule on the motion until it was necessary. Once the information about prior convictions was elicited during the mitigation hearing in response to the judge's question, the prosecution objected and asked for a curative instruction, which the judge gave. The defense requested a mistrial, which was denied.

{¶ 89} The decision whether to grant or deny a mistrial "lies within the sound discretion of the trial court." *Garner*, 74 Ohio St.3d at 59, 656 N.E.2d 623. A mistrial should be declared only when justice requires and when a fair trial is no longer possible. *State v. Franklin*, 62 Ohio St.3d 118, 127, 580 N.E.2d 1 (1991). If an error occurs, such as the jury hearing improper testimony, the "jury is presumed to follow the instructions, including curative instructions, given it by a trial judge." *Garner* at 59.

{¶ 90} In *Garner*, we held that the trial court did not abuse its discretion by failing to order a mistrial when "the reference to the defendant's prior arrests was fleeting and was promptly followed by a curative instruction." *Id.* Here, as in *Garner*, the improper reference to Cepec's prior criminal history was promptly addressed by a curative instruction.

{¶ 91} During mitigation, and prior to Taraschke's testimony, Cepec's uncle, Ricky, testified for the defense that Cepec had engaged in criminal behavior as both a juvenile and an adult. Ricky stated that he believed that both burglary and theft were part of his nephew's adult criminal record. And Cepec's younger brother, Shawn, testified that he was very much aware of his brother's criminal problems.

{¶ 92} Given that the defense itself introduced some evidence of Cepec's criminal history during mitigation, no prejudice occurred as a result of Taraschke's statement, elicited by the trial judge, that "[i]t was always the same pattern of daytime burglaries."

{¶ 93} Finally, Cepec claims that the court improperly strengthened Taraschke's testimony by questioning Taraschke about his experience as a parole officer. The court questioned Taraschke regarding his experience and qualifications as a parole officer before ruling on whether he was qualified to respond to certain questions as one of Cepec's mitigation witnesses. However, Cepec failed to demonstrate that he was prejudiced by the judge's questions. And even if the judge had erred, our independent weighing " 'provides a procedural safeguard against the arbitrary imposition of the death penalty.' " *State v. Bey*, 85 Ohio St.3d 487, 505, 709 N.E.2d 484 (1999), quoting *State v. Holloway,* 38 Ohio St.3d 239, 527 N.E.2d 831 (1988), paragraph two of the syllabus.

{¶ 94} On these grounds, we reject Cepec's second proposition of law.

### *Prosecutorial misconduct*

{¶ 95} In his fifth proposition of law, Cepec challenges four statements made in closing arguments and rebuttal, arguing that the jury would not have recommended the death penalty had the prosecution not argued that the murder and the force with which it was conducted were aggravating circumstances. He asserts that the nature and circumstances of the offense may be considered only on the side of mitigation.

22

{¶ 96} "The test for prosecutorial misconduct during closing arguments is whether the remarks were improper and, if so, whether they prejudicially affected the accused's substantial rights." *State v. Were*, 118 Ohio St.3d 448, 2008-Ohio-2762, 890 N.E.2d 263, ¶ 198. "It is improper for prosecutors in the penalty phase of a capital trial to make any comment before a jury that the nature and circumstances of the offense are 'aggravating circumstances.' " *State v. Wogenstahl*, 75 Ohio St.3d 344, 662 N.E.2d 311 (1996), paragraph two of the syllabus. However, the prosecution "can describe the crime to prove the existence of the statutory aggravating factors." *Kirkland*, 140 Ohio St.3d 73, 2014-Ohio-1966, 15 N.E.3d 818, at ¶ 91.

{¶ 97} "[A] prosecutor may legitimately refer to the nature and circumstances of the offense, both to refute any suggestion that they are mitigating and to explain why the specified aggravating circumstance outweigh[s] mitigating factors." *State v. Sheppard*, 84 Ohio St.3d 230, 238, 703 N.E.2d 286 (1998). "But the state may not tell the decision-maker that the nature and circumstances of the murder itself are the aggravating circumstances." *Kirkland* at ¶ 94.

{¶ 98} Cepec first challenges the following portion of the prosecution's closing argument:

> Steve Cepec—and I'm here to talk—and you're going to hear in the instructions, we're not here to talk to you about the murder itself. We're here to talk about the aggravating circumstances. So that's what I will, for the most part, reserve my comments about.
> Steve Cepec committed that aggravated robbery during the course of the murder of Frank Munz, and he did it with great force and great brutality, and to facilitate that robbery, he took

that hammer and, four times, plunged it deep in to his head. He tied him up with duct tape.

I'm asking you to consider the facts of this aggravated robbery, the amount of force that was used in this aggravated murder. You know what it was, and it was, I suggest to you, a severe and brutal robbery committed on Frank Munz.

{¶ 99} Cepec next challenges the following portion of the closing argument:

Then the burglary, Ladies and Gentlemen, you can consider that burglary that occurred. It's been proven to you beyond a reasonable doubt. And currently, Mr. Cepec is finally taking full account, and we'll talk about that.

And that burglary, Ladies and Gentlemen, was committed in such a calculated and careful manner. He took all the tools of the robbery and burglary over there, and mostly the tools of robbery by his own statement. Although, he changed it today saying something about a safe.

All of the statements before said the hammer and the gun were to rob him and the duct tape, but after he had either killed or mortally wounded Mr. Munz and he lay there bleeding, maybe passing away, his last breath as his nephew hid in the back room, Steve Cepec methodically burglarized the house for about 20 minutes.

{¶ 100} Cepec also challenges the following statements made during the prosecution's rebuttal:

And this trial, the aggravating circumstances, the commission of the murder in the course of aggravated robbery and aggravated burglary and after he broken [sic] detention or while he was under detention, those are the aggravating circumstances, and you can take in to account the force he used in the aggravated robbery.

The two different types—and the activated [sic] burglary and the two types of weapons he used, that he used force to beat Frank Munz in the head to take his money and his property, and the fact that he used a ligature to choke the living air, to choke Frank Munz to death.

And when you consider those aggravating—when you consider whether or not the aggravating circumstances outweigh the mitigating factors* * *.

{¶ 101} Finally, Cepec challenges one additional rebuttal statement:

When you consider the force, you have to look at that. You should look back at the evidence of what Mr. Cepec did to Mr. Munz. The force he used to put eight holes in his head. The ligature he drew around his neck, broke the thyroid [sic] cartilage. You can take into account that force. You can take in to account the fact that he trespassed in to Frank's home, in to Frank Munz's home and did this aggravated robbery and he used the force that he did.

**{¶ 102}** Cepec's counsel did not object to any of these statements. Therefore, Cepec has waived all but plain error.

**{¶ 103}** In each of the statements, the prosecution discussed the R.C. 2929.04(A)(7) aggravating circumstance that the aggravated murder occurred in the course of Cepec's committing aggravated robbery or aggravated burglary. In three of the statements, the prosecution informed the jury that it may take into account the "force" used in the aggravated robbery. In one instance, the prosecution informed the jury that it may consider the "force" used in committing the murder.

**{¶ 104}** However, the prosecution did not directly state that the amount of force was an aggravating circumstance. Instead, the prosecution stated that the jury could take into consideration the amount of force used in committing the crime. This is not an improper statement of law. "[I]t is perfectly acceptable for the state to present arguments concerning the nature and circumstances of the offense." *Wogenstahl*, 75 Ohio St.3d at 355, 662 N.E.2d 311. In fact, the jury must consider the nature and circumstances of the offense in order to determine whether they have a mitigating impact. "In a particular case, the nature and circumstances of the offense may have a mitigating impact, or they may not. * * * Either way, they must be considered." *State v. Stumpf*, 32 Ohio St.3d 95, 99, 512 N.E.2d 598 (1987).

**{¶ 105}** Finally, the jury received instructions not to consider the murder as an aggravating circumstance. While in deliberations, the jury submitted a written inquiry to the court on whether it could consider the murder itself as a contribution to the aggravating circumstances because it was committed during the aggravated robbery. After consultation with both prosecution and defense counsel, the judge informed the jury that it could not.

**{¶ 106}** Cepec fails to establish plain error regarding the closing statements. Therefore, we reject Cepec's fifth proposition of law.

*Ineffective assistance of counsel*

*Lack of continuity in opening and closing statements*

{¶ 107} In support of his fourth proposition, Cepec alleges that he received ineffective assistance because his counsel's theory of the case changed between the opening statement and closing arguments and because counsel's arguments allegedly did not comport with the evidence introduced at trial. He claims that counsel were ineffective for failing to maintain continuity, thereby sacrificing credibility during mitigation.

{¶ 108} In the opening statement, Cepec's counsel raised doubts as to whether Cepec committed the murder. Counsel referenced potential witnesses who may have had knowledge of the crime, implied that others may have committed the crime or had motive to do so, cast doubt on the prosecution's timeline of events, and discussed unidentified DNA found at the scene.

{¶ 109} In the closing argument, however, Cepec's counsel revised their argument. They acknowledged that Cepec had killed Frank, but contended that the charge should be murder, not aggravated murder. Counsel stated that Cepec's actions were the actions of a thief and burglar, not a murderer—that there was no prior calculation and design. Furthermore, they argued that Cepec was still impacted from his drug binge the prior night and that he had been remorseful the following day.

{¶ 110} Considering the volume of evidence introduced over the course of the trial, Cepec's counsel may have made a tactical decision to adjust their approach. During trial, the jury was exposed to most of the concepts that the defense discussed during the opening statement: that Palmer may have been involved in planning or carrying out the robbery, that Paul could have framed Cepec, and that additional, unidentified DNA was found at the scene. By the close of trial, Cepec's counsel may have determined that the jury likely would conclude

that the prosecution had met its burden of proof, thus prompting the defense to adapt its closing arguments.

{¶ 111} We hold that Cepec's counsel were not deficient for changing tactics during the course of the trial. "[D]ebatable trial tactics do not establish ineffective assistance of counsel." *State v. Leonard*, 104 Ohio St.3d 54, 2004-Ohio-6235, 818 N.E.2d 229, ¶ 146. "Nor does a midtrial change in strategy necessarily constitute deficient performance." *Mundt*, 115 Ohio St.3d 22, 2007-Ohio-4836, 873 N.E.2d 828, at ¶ 134.

{¶ 112} Even if the change in tactics was arguably deficient, it was not prejudicial. In fact, the jury acquitted Cepec of prior calculation and design. Cepec cannot show that he was deprived of a fair trial as a result of the inconsistent arguments between opening and closing.

*Failure to object to statements based on relevance and prejudice*

{¶ 113} Cepec also alleges ineffective assistance on the ground that his counsel failed to object on the basis of relevance and prejudice to the admission of Cepec's pretrial statements that he wanted to die or that he deserved the death penalty.

{¶ 114} Cepec made numerous statements during the days and months after the murder stating that he deserved to die for what he had done or that an "eye for an eye" should apply. The statements were made to a variety of law-enforcement officers and were admitted into evidence through the testimony of Medina County Sheriff's Department Detective Todd Hicks and Deputy Marie Kriz, both now retired, and deputies Chris Falkenstein, and Steve Clark. Although Cepec's counsel objected during trial to the admission of the statements on the basis of *Miranda*, Cepec alleges that counsel were ineffective for failing to separately object on the grounds that the statements were irrelevant and prejudicial.

{¶ 115} " 'Relevant evidence' means evidence having any tendency to make the existence of any fact that is of consequence to the determination of the

action more probable or less probable than it would be without the evidence." Evid.R. 401. Cepec pleaded not guilty to each of the counts. Therefore, the prosecution had the burden to prove his guilt. A defendant's statements, "like other conduct following the completion of a crime, may be relevant evidence of consciousness of guilt." *State v. Johnson*, 144 Ohio St.3d 518, 2015-Ohio-4903, 45 N.E.3d 208, ¶ 72. And " '[e]vidence of consciousness of guilt * * * [is evidence] of guilt itself.' " *Id.*, quoting *State v. Williams*, 79 Ohio St.3d 1, 11, 679 N.E.2d 646 (1997). Thus, Cepec's statements indicating that he believed he deserved the death penalty were relevant evidence of his guilt.

**{¶ 116}** Even relevant evidence, however, "is not admissible if its probative value is substantially outweighed by the danger of unfair prejudice, of confusion of the issues, or of misleading the jury." Evid.R. 403(A). Cepec makes a blanket allegation that the questioned evidence is "irrelevant and extremely prejudicial." However, he fails to describe how the probative value of the statements was outweighed by the danger of unfair prejudice.

**{¶ 117}** Furthermore, "the failure to make objections is not alone enough to sustain a claim of ineffective assistance of counsel." *State v. Conway*, 109 Ohio St.3d 412, 2006-Ohio-2815, 848 N.E.2d 810, ¶ 103. Because a failure to object is insufficient to demonstrate ineffective assistance, and because Cepec fails to show prejudice, he cannot demonstrate that his trial counsel were ineffective for failing to object to certain pretrial statements as irrelevant and prejudicial during the trial phase.

**{¶ 118}** Finally, Cepec's allegation that counsel failed to object to the admission of these statements during the penalty phase is inaccurate. While reviewing the exhibits to be admitted in the penalty phase, Cepec's counsel requested that Cepec's statements that he deserved to die be excluded. In response, the trial judge instructed the jury not to consider the statements in deciding whether

to recommend the death sentence. Thus, Cepec's counsel successfully excluded the questioned statements from the penalty phase.

*Damaging testimony*

{¶ 119} During the mitigation phase, Cepec alleges that his counsel were ineffective because they elicited testimony that was damaging to him. Specifically, he claims that his counsel presented an unfocused, "scattershot defense" that opened the door to testimony revealing that he had spent most of his life in prison, had a prior criminal record that included instances of violence, experienced disciplinary problems in prison, and had a history of malingering and faking illnesses.

{¶ 120} In support, Cepec alleges a number of similarities between his case and that described in *Mitts v. Bagley*, 620 F.3d 650 (6th Cir.2010), *rev'd on other grounds*, *sub nom. Bobby v. Mitts*, 563 U.S. 395, 131 S.Ct. 1762, 179 L.Ed.2d 819 (2011). In *Mitts*, the Sixth Circuit Court of Appeals determined that defense counsel had been deficient for pursuing a blackout defense when their sole expert had testified (1) that Mitts did not experience a blackout and (2) that voluntary alcohol intoxication would never render a person unable to form criminal intent. The court determined that Mitts's counsel was deficient for failing to fully investigate before presenting expert testimony that directly contradicted their defense. *Id.* at 659.

{¶ 121} Cepec claims that his case parallels *Mitts*, presumably on the basis that some of the testimony elicited from Cepec's experts contradicted his defense. However, this is an inappropriate comparison. In *Mitts*, counsel called a single expert witness during the trial phase, and the expert's opinion of alcohol intoxication directly contradicted and undermined the entire focus of Mitts's defense.

{¶ 122} Cepec, however, presented a number of experts during the *mitigation phase*, and the expert testimony did not undermine his mitigation

30

defense. Instead, various witnesses testified regarding different mitigating factors, including drug addiction, mental-health issues, and Cepec's ability to adapt to a prison environment.

**{¶ 123}** "[S]trategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable." *Strickland*, 466 U.S. at 690-691, 104 S.Ct. 2052, 80 L.Ed.2d 674. "[C]ounsel's decision whether to call a witness falls within the rubric of trial strategy and will not be second-guessed by a reviewing court." *State v. Treesh*, 90 Ohio St.3d 460, 490, 739 N.E.2d 749 (2001). "The presentation of mitigating evidence is a matter of trial strategy." *State v. Hand*, 107 Ohio St.3d 378, 2006-Ohio-18, 840 N.E.2d 151, ¶ 225.

*Failure to demonstrate mental-health issues and head injury*

**{¶ 124}** Cepec also contends that his counsel were ineffective at the mitigation phase because they failed to demonstrate his brain impairment and mental-health issues. This is inaccurate. As described below in our independent sentence evaluation, there was extensive testimony offered during mitigation to demonstrate Cepec's history of mental-health issues. Additionally, Cepec's counsel alluded to Cepec's history of head injuries during mitigation. However, they chose not to introduce evidence of head injuries after investigating the topic with an expert. This was an affirmative strategic decision, and the jury was instructed to disregard any discussion on that topic.

**{¶ 125}** As previously mentioned, strategic trial decisions are "virtually unchallengeable." *Strickland* at 690-691. And "[t]he presentation of mitigating evidence is a matter of trial strategy." *Hand* at ¶ 225. Accordingly, we reject Cepec's ineffective-assistance claims.

**Settled issues**

**{¶ 126}** In his seventh proposition of law, Cepec raises several constitutional challenges to Ohio's capital-punishment laws. He also claims that Ohio's death-penalty statutes violate international law and a variety of treaties to

which the United States is a party. This court has previously considered and rejected each of the constitutional claims. *See State v. Thompson*, 141 Ohio St.3d 254, 2014-Ohio-4751, 23 N.E.3d 1096, ¶ 279-280. And this court has similarly held that Ohio's death-penalty statutes do not violate international law or treaties. *Id.* Therefore, we reject Cepec's seventh proposition of law.

## INDEPENDENT SENTENCE EVALUATION

{¶ 127} R.C. 2929.05 requires this court to independently review the imposition of the death penalty for appropriateness and proportionality. To conduct an independent review of a death sentence under R.C. 2929.05(A), we must determine (1) whether the evidence supports the jury's finding of guilt on the aggravating circumstances, (2) whether the aggravating circumstances outweigh the mitigating factors beyond a reasonable doubt, and (3) whether Cepec's death sentence is proportionate to those affirmed in similar cases.

{¶ 128} After weighing the facts and evidence as set forth below, we conclude that the evidence supports the jury's finding of guilt on the aggravating circumstances, that the aggravating circumstances outweigh the mitigating factors beyond a reasonable doubt, and that Cepec's death sentence is appropriate and proportional.

### *Aggravating circumstances*

{¶ 129} After merger, Cepec's sentence on the murder conviction was imposed only for aggravated murder while committing aggravated robbery. That count included four capital specifications: kidnapping, aggravated robbery, aggravated burglary, and committing murder while under detention or having broken detention. The kidnapping capital specification merged into the aggravated-robbery specification. So at the time of sentencing, the aggravating circumstances to be weighed against the mitigating factors were that Cepec had committed the aggravated murder (1) while committing aggravated robbery, (2) while committing aggravated burglary, and (3) while under detention or having broken detention.

32

*Aggravated-robbery specification—R.C. 2929.04(A)(7)*

{¶ 130} The evidence at trial was sufficient to support Cepec's conviction as the principal offender in committing the aggravated murder of Frank while committing aggravated robbery. R.C. 2929.04(A)(7).

{¶ 131} Cepec entered the Munz home with a hammer, duct tape, and a BB gun that looked like a real firearm with the intention of robbing Frank. He pulled the gun and told Frank that he was robbing him, and then Cepec tied Frank's hands with the duct tape. After Frank was duct-taped, Cepec stole Frank's keys from his pocket and emptied his wallet. He also removed Frank's shirt.

{¶ 132} When Frank struggled to break free, Cepec hit him in the head with the claw end of the hammer. Cepec then strangled him with a lamp cord and struck him in the head with the hammer three more times. Frank's death was caused by both the strangulation and the blows to the head.

*Aggravated-burglary specification—R.C. 2929.04(A)(7)*

{¶ 133} Sufficient evidence also supports Cepec's conviction as the principal offender in committing the aggravated murder of Frank while committing aggravated burglary. R.C. 2929.04(A)(7).

{¶ 134} After robbing Frank, Cepec proceeded to burglarize the house. He emptied several coffee cans full of change and "[d]ozens of pieces of jewelry" into bags and piled them near the front door. And he took loose change and other items from the top of Frank's dresser and pocketed the items.

{¶ 135} He used towels from the house to clean himself and to wipe down the murder weapons, and he changed into a shirt that he took from the house. The bloody towels were bagged with the other items that he intended to take with him upon leaving. He also used his socks as gloves to ensure that he would not leave fingerprints while burglarizing the house.

*Under detention or having broken detention—R.C. 2929.04(A)(4)*

{¶ 136} Finally, there is sufficient evidence to support Cepec's conviction of aggravated murder while under detention or having broken detention. R.C. 2929.04(A)(4). A person under the supervision of the Adult Parole Authority ("APA") is under detention as defined in R.C. 2921.01(E) and 2967.15(C)(2). A parolee commits the crime of escape when, among other provisions, the person "purposely break[s] or attempt[s] to break the supervised release detention or purposely fail[s] to return to the supervised release detention * * * following temporary leave granted for a specific purpose or limited period." R.C. 2921.34(A)(3). We have previously upheld the escape conviction of a parolee assigned to a halfway house who failed to return as required. *State v. Thompson,* 102 Ohio St.3d 287, 2004-Ohio-2946, 809 N.E.2d 1134, ¶ 19.

{¶ 137} Cepec was paroled from the Belmont Correctional Institution effective July 6, 2009. His parole was to continue for at least one year. After a parole violation, in May 2010, Cepec was ordered to complete a halfway-house program.

{¶ 138} On May 28, 2010, the same day that Cepec was transported to the halfway house, he left to go to the hospital and did not return. A warrant was issued on May 29, and Cepec remained at large until his arrest on June 3, 2010. Thus, at the time of Frank's murder on June 3, Cepec had broken detention.

### *Mitigating factors*

{¶ 139} We must weigh the above aggravating circumstances against any mitigating evidence about "the nature and circumstances of the offense" and Cepec's "history, character, and background," R.C. 2929.04(B), as well as the specific mitigating factors set forth in 2929.04(B)(1) through (6) and in the 2929.04(B)(7) catchall provision.

{¶ 140} Cepec presented 14 mitigation witnesses and seven exhibits and gave an unsworn statement.

*Mental health and learning disabilities*

**{¶ 141}** Cepec's witnesses testified that he began having behavioral issues at an early age. His fourth-grade teacher, Carl Medure, reported that Cepec had problems getting along with his peers. He was referred to the school psychologist for behavioral difficulties. Although Cepec had above-average mental abilities with an IQ of 115, he had problems concentrating and working with other students.

**{¶ 142}** Following this referral, Terry Shuman, the school psychologist, enrolled Cepec in a tutorial program for the learning-disabled, both because of his behavior and because he was not achieving at the level of his mental ability. Shuman suspected that Cepec had attention deficit disorder ("ADD"), but Cepec was never officially diagnosed. Shuman presumed Cepec's difficulties to be caused by chemical dependency. Shuman also testified that people with ADD are more likely to be impulsive and may attempt to self-medicate with caffeine or other chemicals, such as cocaine.

**{¶ 143}** In the eighth grade, Shuman moved Cepec to a program for those with severe behavioral disorders. Cepec eventually returned to the learning-disability tutorial program. Cepec's behavior worsened dramatically as he got older. Shuman last saw Cepec in 10th grade.

**{¶ 144}** A number of psychological experts also testified on Cepec's behalf during the mitigation phase. Dr. Bruce Maaser, a clinical psychologist at the Ohio Department of Rehabilitation and Correction's Correctional Reception Center ("CRC"), first met Cepec after Frank's murder when Cepec was on the crisis-stabilization unit for suicide watch. Dr. Maaser stated that Cepec was diagnosed with a recurrent, severe, major depressive disorder. He had originally diagnosed Cepec with antisocial personality disorder, but later felt that Cepec didn't fit the diagnostic criteria, because Cepec had expressed remorse. Additionally, Dr. Maaser worked with Cepec to address symptoms of posttraumatic stress disorder ("PTSD") that he alleged was caused by Frank's murder. However, the

prosecution's rebuttal witness, psychologist Dr. Dennis Eshbaugh, testified that Cepec was never officially diagnosed with PTSD and that he has never seen PTSD in the perpetrator of a crime. He stated that the offender "wouldn't necessarily be horrified by the event because they've actually done the event."

{¶ 145} Dr. Sagi Raju, a psychiatrist at the Warren Correctional Institute ("WCI"), began treating Cepec in 2012 and continued treatment through the trial. He testified that Cepec had a major depressive disorder with a history of self-injury. He arrived at WCI on a mandated-medication program. When the medication mandate expired, Cepec refused to take his medications and experienced restless sleep, anxiety, and excessive worry, so he was ordered again to take his medication. Cross-examination revealed notes in the prison medical records concerning malingering, but Dr. Raju testified that Cepec had been diagnosed with a mental illness and was appropriately treated.

{¶ 146} Dr. Mujgan Inciler, a psychologist at WCI, became Cepec's mental-health liaison upon Cepec's transfer there in 2012. According to Dr. Inciler, Cepec's diagnoses are major depressive disorder, PTSD, antisocial-personality disorder, and borderline personality disorder. Cepec had not tried to injure himself since his arrival. Cross-examination focused on a note from Dr. Inciler's files documenting that Cepec was "hoping not to be found competent."

{¶ 147} While on parole during 2009 and 2010, Cepec began a cognitive behavioral educational program and later, Taraschke ordered him to attend. Cepec stopped attending in March 2010, having missed nine appointments between then and September 2009. Taraschke testified that he had attempted to get Cepec substance-abuse and mental-health treatment, but Cepec was noncompliant and denied having either problem. Cepec also injured himself while incarcerated for parole violations, once by swallowing part of a razor blade. Taraschke believed that Cepec self-injured to obtain accommodation or benefit by being released from

custody. On two previous occasions, the state had released Cepec for self-injury while on parole so that it would not be responsible for his medical expenses.

**{¶ 148}** Dr. James Siddall, a psychologist, testified that Cepec had "a significant history of substance abuse, some depression, social alienation, and antisocial behavior." Cepec's records showed mental-health treatment from age 18 on, and providers typically prescribed him antidepressants and mood-stabilizing medications. He classified Cepec in the 50 percent of inmates who exaggerate their symptoms, but he believed that Cepec was not faking a physical or mental illness and was not depressed at the time of his evaluation.

**{¶ 149}** Upon cross-examination, the prosecution used various prison records to suggest that Cepec was malingering when he claimed to be injured or ailing. According to those records, Cepec was rocking on his bed as if in pain, then stopped as soon as medical personnel stepped out of sight. Similarly, Cepec reported needing to go to the hospital to have screws that he swallowed removed, but upon arrival at the hospital, Cepec reported that he had previously defecated the screws.

**{¶ 150}** A note from psychologist Dr. Yavornitzky's files reported that Cepec had been engaged in "calculated and disruptive self-injurious behavior for obvious pursuit of pain medication." Similar reports specified that Cepec had been probably "opiate seeking" when swallowing the razor and was not truly suicidal. According to Dr. Siddall, Cepec had described his own self-injurious behavior and "said it was partly his expression of anger and frustration, not getting what he was interested in getting."

*Substance abuse*

**{¶ 151}** In his unsworn statement, Cepec stated that he became addicted to drugs at age 12 through his uncle, Ricky. Terry Shuman testified that at school, a substance-abuse referral was made due to behaviors that commonly indicate drug abuse, such as missing school, apathy, and lack of memory skills.

{¶ 152} As a result of juvenile criminal behavior, Cepec eventually was supervised by the Medina County Juvenile Court. According to Jody Albertson, that court's chief probation officer, Cepec received both inpatient and outpatient drug treatment. A consultant for the juvenile court, Emily Sanderson, worked with Cepec and his family in 1983, eventually arranging for inpatient drug treatment at Fairview Deaconess in Minnesota when Cepec was 14 or 15 years old. However, Cepec was still in need of counseling when he left treatment, and she noted at the time that his prognosis was poor.

{¶ 153} Cepec's substance abuse continued into adulthood. Dr. Siddall diagnosed him with polysubstance dependence with a high level of tolerance and possible withdrawal symptoms associated with a number of drugs and drug classes, including marijuana, cocaine, and opiates.

{¶ 154} Just before the incidents leading to Frank's murder, Cepec was ordered to attend a halfway-house drug-treatment program as a sanction for a parole violation. Rather than complete the program, Cepec left the halfway house and did not return. Instead, Cepec spent the weekend with his girlfriend, taking Percocet, smoking crack, and drinking beer and wine. According to Cepec's unsworn statement, he used crack for the first time that weekend, and once he did it, that was all he wanted.

*Family history*

{¶ 155} Dr. Siddall determined that Cepec had a multigenerational history of alcoholism. Additionally, his mother was a drug addict, and his parents separated when he was about two years old. Thereafter, Cepec had no contact with his mother until he was 18 years old.

{¶ 156} Ricky Cepec and Shawn Cepec, Cepec's younger brother, also testified regarding family history. Cepec had lived in Medina in half a duplex, and his grandparents and Ricky lived on the other side. Cepec lived with his father, stepmother, brothers, the woman now his stepmother, and her son. His

grandparents fought daily and were physically violent toward each other. According to Ricky, Cepec's father and grandfather subjected the children to physical violence. The allegations of physical violence toward the children, however, were disputed. Shawn Cepec admitted on cross-examination that he previously testified that Cepec had not been physically abused.

{¶ 157} Both Ricky and Shawn testified that Cepec had received little attention from his parents growing up. Both were unaware that Cepec's stepmother had attended his school events and that his father had driven him to Minnesota for inpatient drug treatment. The juvenile court consultant noted that his family was uncooperative with the aftercare of his drug treatment.

{¶ 158} As an adult on parole, Cepec's approved residence was with his father. During cross-examination, Taraschke stated that Cepec's father was loving and caring but not supportive of Cepec's working, because the father had wanted to keep an eye on Cepec upon Cepec's release from prison. Cepec corroborated this assessment in his unsworn statement, stating, "[M]e and my dad missed each other" during the 20 years of Cepec's imprisonment and that Cepec had felt that the parole officer was trying to keep Cepec away from his family.

{¶ 159} Dr. Eshbaugh noted that Cepec had described his relationship with his father inconsistently. During most interviews, Cepec had described his family as fairly ordinary without abuse, but at least once had described his father as a very abusive alcoholic. And Dr. Siddall testified that Cepec had revealed his relationships with his father and grandmother to be "largely positive" and that he had had a happy childhood.

*Adaptability to prison life*

{¶ 160} Several correctional institution staff members testified that Cepec adapts well to the structure of prison life. Brenda Okorocha, a nurse at CRC, stated that Cepec was very polite and got along well with security staff. Dr. Inciler likewise stated that Cepec had been very manageable at WCI. He was appreciative,

polite, and courteous. While there, he had not demonstrated any self-injurious behavior.

{¶ 161} Dr. Siddall similarly testified that when incarcerated, Cepec has done well under high-intensity treatment; in that circumstance, he was cooperative and had few disciplinary problems. Dr. Siddall acknowledged, however, that when not in high-intensity treatment, Cepec had behaved violently—fighting, possessing shanks, and hitting a female guard.

{¶ 162} Dr. Maaser opined that Cepec is not a danger to anyone else in prison, although Cepec might become self-injurious depending on the verdict. Between therapy and medications, Dr. Maaser believed that Cepec could be maintained in a prison setting.

{¶ 163} Finally, Michael Beebe, a regional administrator for the APA, testified that if Cepec were sentenced to life with parole eligibility after 25 years, Cepec could not be paroled under any circumstances until 2037 and might never be paroled.

*Remorse*

{¶ 164} In Cepec's unsworn statement, he expressed remorse for killing Frank and apologized to Frank's family, saying, "I'm terribly sorry. I'll never forget Frank, never, no matter what. All my life I'll never forget him. I at least owe him that much. I know what I did was pure evil, but I did it." Dr. Maaser agreed that Cepec was remorseful and opined that Cepec suffered PTSD from committing the murder.

*Employment history*

{¶ 165} Having spent the majority of his adult life in prison, Cepec did not have a significant work history. For three or four months in 2010, while he was on parole, Cepec worked for Kevin Minor's cleaning business. Minor testified that when Cepec started, his performance was "[g]ood, real good." There were no complaints with his work, and none of Minor's equipment was missing. Cepec's

work remained good until he disappeared. "Everything was good up until a certain point, and then he was just gone."

### *Sentence evaluation*

{¶ 166} Evidence on two categories of mitigating factors was offered to the jury: (1) Cepec's mental state at the time the crime was committed, R.C. 2929.04(B)(3); and (2) the catchall provision, which requires consideration of any other factors that are relevant to the issue of whether he should be sentenced to death, 2929.04(B)(7). We find that none of the remaining mitigating factors enumerated in R.C. 2929.04(B) apply.

{¶ 167} With respect to Cepec's mental state, we find that the factor is not entitled to any weight. Cepec has provided no indication of mental disease or defect that would have prevented him from appreciating the criminality of his conduct or from conforming his conduct to the law at the time of the murder. In fact, his actions in cleaning up the murder scene, bagging up the murder weapons to take with him, and wearing socks on his hands to avoid leaving fingerprints confirm that he understood that his conduct was criminal. His assertion of mental-health problems, therefore, do not qualify as a mitigating factor under R.C. 2929.04(B)(3).

{¶ 168} This evidence is relevant, however, under the catchall provision of R.C. 2929.04(B)(7). *See, e.g., Treesh,* 90 Ohio St.3d at 492, 739 N.E.2d 749 (considering evidence of mental problems under R.C. 2929.04(B)(7) when evidence did not satisfy the criteria of R.C. 2929.04(B)(3)); *State v. Fears,* 86 Ohio St.3d 329, 349, 715 N.E.2d 136 (1999). First, we find that no weight should be accorded to Cepec's claims that he suffers from PTSD as a result of the murder. Under the circumstances, we accord little weight in mitigation to his other mental-health conditions, including depression, antisocial-personality disorder, and dependence on drugs. *See, e.g., State v. Cunningham,* 105 Ohio St.3d 197, 2004-Ohio-7007, 824 N.E.2d 504, ¶ 137.

**{¶ 169}** This court has accorded little weight to personality disorders "when they do not cause mental illness so severe as to inhibit a defendant's ability to control his actions." *State v. Hoffner*, 102 Ohio St.3d 358, 2004-Ohio-3430, 811 N.E.2d 48, ¶ 119. Therefore, little weight should be accorded to his antisocial- and borderline- personality disorders. His depression likewise is a weak mitigating factor. Testimony indicated that his depression may have been partially situational due to incarceration, and it does not appear to have played a role in the crimes. *Id.*

**{¶ 170}** Cepec's 25-year history of alcohol and polysubstance dependence should be accorded some weight. *State v. Craig,* 110 Ohio St.3d 306, 2006-Ohio-4571, 853 N.E.2d 621, ¶ 146.

**{¶ 171}** We also give some weight to the love and support Cepec shares with his family. *See State v. Myers,* 97 Ohio St.3d 335, 2002-Ohio-6658, 780 N.E.2d 186, ¶ 178. We also give some weight to the evidence of a troubled family life during childhood.

**{¶ 172}** However, we accord no weight to his work history. Most of his adult life was spent in prison, and his work experience comprised six to 20 hours a week for a few months before leaving his employer without notice.

**{¶ 173}** We accord minimal weight to Cepec's adaptability to prison life. *Hand,* 107 Ohio St.3d 378, 2006-Ohio-18, 840 N.E.2d 151, at ¶ 281. Although he experienced few incidents while under the more controlled environment of the crisis-stabilization unit, his history in the general prison population includes fighting with other inmates, possessing a weapon, and assaulting a guard.

**{¶ 174}** Finally, Cepec's remorse, both in his unsworn statement and his statements to prison psychological staff, is accorded minimal weight. *State v. Hale,* 119 Ohio St.3d 118, 2008-Ohio-3426, 892 N.E.2d 864, ¶ 274. Cepec attempted to flee from police after murdering Frank and gave false stories to law enforcement about his role in Frank's murder.

{¶ 175} We find that the aggravating circumstances (aggravated robbery, aggravated burglary, and broken-detention specifications) outweigh the mitigating factors beyond a reasonable doubt.

### *Proportionality*

{¶ 176} The imposition of the death penalty in this case is proportionate when compared with other aggravated murders committed during the course of an aggravated robbery and an aggravated burglary. *See, e.g., State v. Ketterer,* 111 Ohio St.3d 70, 2006-Ohio-5283, 855 N.E.2d 48, ¶ 207; *State v. Jones,* 90 Ohio St.3d 403, 423, 739 N.E.2d 300 (2000). And the death penalty is proportionate when compared with cases involving murders while the offender is under detention or has broken detention. *See, e.g., State v. Ferguson,* 108 Ohio St.3d 451, 2006-Ohio-1502, 844 N.E.2d 806, ¶ 135.

### CONCLUSION

{¶ 177} For the foregoing reasons, we affirm the convictions and death sentence.

Judgment affirmed.

PFEIFER, O'DONNELL, LANZINGER, KENNEDY, and FRENCH, JJ., concur.

O'NEILL, J., concurs in part and dissents in part for the reasons set forth in his dissenting opinion in *State v. Wogenstahl*, 134 Ohio St.3d 1437, 2013-Ohio-164, 981 N.E.2d 900.

_____

Dean Holman, Medina County Prosecuting Attorney, and Matthew A. Kern and James M. Price, Assistant Prosecuting Attorneys, for appellee.

Nathan A. Ray and Adam M. Van Ho, for appellant.

_____