[Cite as *Johnson v. U.S. Title Agency, Inc.*, 2020-Ohio-4056.]

## COURT OF APPEALS OF OHIO

## EIGHTH APPELLATE DISTRICT
## COUNTY OF CUYAHOGA

RICHARD G. JOHNSON, ESQ.          :

    Plaintiff-Appellant,          :

                                              No. 108547

    v.          :

U.S. TITLE AGENCY, INC., ET AL.,          :

    Defendants-Appellees.          :

---

JOURNAL ENTRY AND OPINION

**JUDGMENT:** AFFIRMED
**RELEASED AND JOURNALIZED:** August 13, 2020

---

Civil Appeal from the Cuyahoga County Court of Common Pleas
Case No. CV-11-760834

---

*Appearances:*

Kehoe & Associates, L.L.C., Robert D. Kehoe, and Lauren N. Orrico, *for appellant.*

Meyers, Roman, Friedberg & Lewis, and Ronald P. Friedberg, *for appellee* U.S. Title Agency, Inc.

Sikora Law, L.L.C., and Alexander E. Goetsch, *for appellee* Chicago Title Insurance Company.

MARY J. BOYLE, P.J.:

{¶ 1} Plaintiff-appellant, Richard G. Johnson ("Johnson") appeals from (1) the trial court's order bifurcating his bad-faith claim, (2) the trial court's

judgment reflecting the jury verdict against Johnson, (3) the trial court's order granting a directed verdict on Johnson's negligence claim, and (4) the trial court's judgment denying his motion for a new trial. He raises six assignments of error for our review:

1. The trial court erred by failing to follow the mandate of the Eighth District Court of Appeals, in violation of the law of the case doctrine.

2. The trial court erred in granting a directed verdict in favor of U.S. Title on Johnson's negligence claim.

3. The trial court erred in bifurcating the entirety of Johnson's bad faith claim.

4. The trial court erred in denying Johnson's Motion for New Trial in the face of cumulative errors.

5. The trial court erred by striking substantial portions of the video testimony of Ed Horejs.

6. The trial court prejudiced Johnson by showing clear bias in favor of Appellees.

{¶ 2} Finding no merit to his assignments of error, we affirm the trial court's judgments.

## I. Factual Background and Procedural History

### A. Procedural History Before Trial

{¶ 3} Johnson originally filed his action against defendant-appellee, U.S. Title Agency, Inc. ("U.S. Title"), in July 2011. But in March 2012, Johnson filed an amended complaint, and joined defendant-appellee, Chicago Title Insurance Company ("Chicago Title"). We will refer to defendants collectively as "appellees." Johnson asserted six counts in his complaint: (1) breach of contract against U.S.

Title, (2) breach of contract against Chicago Title, (3) specific performance and injunctive relief against both U.S. Title and Chicago Title, (4) negligence against U.S. Title, (5) breach of fiduciary duty against U.S. Title, and (6) breach of the duty of good faith and fair dealing against both title companies.

{¶ 4} All three parties moved for summary judgment. The trial court granted appellees' motions for counts I, II, III, and VI and denied Johnson's motion, finding that Johnson was not a party to or beneficiary of KeyBank's closing instructions. Johnson appealed, but this court dismissed the appeal because Counts IV and V of the amended complaint had not been resolved. *Johnson v. U.S. Title Agency, Inc.*, 8th Dist. Cuyahoga No. 100535 (Nov. 15, 2013). On remand, the trial court then dismissed Counts IV and V, without prejudice, pursuant to Civ.R. 41(A). Johnson appealed again, but this court dismissed the appeal because the Civ.R. 41(A) dismissal was insufficient to create a final appealable order. *Johnson v. U.S. Title Agency, Inc.*, 8th Dist. Cuyahoga No. 101156 (June 13, 2014).

{¶ 5} U.S. Title and Johnson filed "renewed" motions for summary judgment. (Chicago Title did not need to file a renewed motion because Counts IV and V were against only U.S. Title.) In September 2015, the trial court granted summary judgment for appellees on all counts, including IV and V. Johnson filed his third appeal, arguing that the trial court erred in granting summary judgment to appellees. *Johnson v. U.S. Title Agency, Inc.*, 2017-Ohio-2852, 91 N.E.3d 76, ¶ 1 (8th Dist.). This court found that there were genuine issues of material fact on all counts and, in May 2017, the majority reversed and remanded "for future

proceedings consistent with the law and this decision," with Judge Keough dissenting. *Id.* at ¶ 82.

{¶ 6} In November 2017, appellees moved to bifurcate Johnson's claim for bad faith. Johnson did not oppose this motion, and the trial court granted it. In May 2018, Johnson moved in limine for the trial court to preclude arguments inconsistent with *Johnson*, 2017-Ohio-2852, 91 N.E.3d 76. The trial court granted the motion after the commencement of trial.

**B. Jury Trial**

{¶ 7} A nine-day jury trial commenced in July 2018. For his case in chief, Johnson's counsel called (1) Johnson; (2) Mark Wachter, Johnson's real estate attorney; (3) Mike Gerome, a closing agent for U.S. Title, as if on cross-examination; and (4) Ed Horejs, a representative for Chicago Title, via video deposition as if on cross-examination.

{¶ 8} In 2008, Johnson purchased a home in Bentleyville, Ohio. In the late spring or early summer of 2009, he hired a contractor, Jack Fyffe, to renovate his home. That fall, Johnson terminated Fyffe for not paying the subcontractors. Fyffe had completed much of the work on the third floor of the home, but the renovation was not complete.

{¶ 9} In early 2010, Johnson hired Berns Custom Homes ("Berns") as the general contractor to continue the renovation while Johnson lived at the property. Johnson retained real estate attorney, Wachter, to negotiate the construction loan agreement with KeyBank and the contract with Berns. Johnson entered a

construction loan agreement with KeyBank in the amount of $815,581.00 to satisfy the existing mortgage on his property (approximately $334,000.00) and to finance the remaining renovations ($477,723.00). Johnson testified that he thought the $477,723.00 would proceed through escrow, but pursuant to a construction holdback provision, KeyBank held the $477,723.00 until Johnson made draw requests as construction progressed.

{¶ 10} On Wachter's recommendation, Johnson and KeyBank selected U.S. Title as the closing, escrow, and title agent for the loan closing. U.S. Title was an insurance agent for Chicago Title. Johnson testified that he verbally instructed Wachter to tell U.S. Title to make sure Johnson "got the same protections that KeyBank did" for the closing. Wachter testified that he verbally told Gerome, a closing agent for U.S. Title, that Johnson "should get every bit of coverage that's being provided to the bank in favor of him." Wachter testified that he was "not aware of any" written instructions from Johnson to U.S. Title. Gerome testified that he did not remember whether he talked to Wachter about title insurance.

{¶ 11} KeyBank provided written closing instructions to U.S. Title for the loan closing. The closing instructions provided that "[t]he title insurance commitment and final policy must not contain any exception or exclusion from coverage based on the existence or possibility of mechanic's liens." The document stated that "[a]ll standard exceptions (such as matters of survey, rights or parties in possession, mechanics liens and standard exceptions not evidenced by a specific instrument recorded against the property) must be deleted." The closing

instructions further provided that "[a]ll documents are to be executed exactly as typed." The document also contained a closing agent certification, stating: "These instructions set forth our requirements for closing the above captioned loan. * * * As used herein, 'closing' shall mean the execution by the Borrower(s) and Mortgagor(s) of all required loan documents as specified herein." Wachter testified that Johnson was both the borrower and mortgagor, and Wachter agreed that "KeyBank actually made it clear that in order to close the transaction, U.S. Title only needed Mr. Johnson to execute the closing documents[.]"

{¶ 12} Johnson reviewed the closing instructions and "agreed" with them. Johnson did not send U.S. Title his own set of written closing instructions but testified that he verbally told a U.S. Title closing agent that KeyBank's closing instructions were his instructions as well.

{¶ 13} The closing took place on May 27, 2010. Documents executed at the closing included the mortgage and the construction loan agreement with a rider. Johnson explained that the rider would go into effect when the renovation was completed. He stated that pursuant to the rider, "the construction mortgage turns into a permanent mortgage, so you do one closing rather than having to do two closings." U.S. Title recorded the mortgage on June 2, 2010.

{¶ 14} The loan agreement outlined requirements for each disbursement of the $477,723.00 to Johnson, which included updated title searches and lien releases. The loan agreement also included a contractor's consent clause, which provided that the contractor "hereby subordinates its lien on the Property, now

existing or hereafter arising, to the lien of the Security Documents." The consent clause contained a signature block for Justin Berns, Authorized Signatory, with the May 27, 2010 closing date. However, Justin Berns did not sign the consent clause. Wachter testified that he never had a conversation with Gerome or anyone at U.S. Title about having Berns sign the consent clause. Nor did Wachter follow up to confirm that Berns had signed the consent clause. Wachter explained that a lien subordination was not "part of the negotiation with Berns" and that he never contacted Berns to ask if he would be willing to sign a lien subordination.

{¶ 15} U.S. Title offered Johnson closing protection coverage via a closing protection letter as required by R.C. 3953.32. The letter provided that the coverage indemnified Johnson for any loss of settlement funds resulting from certain conditions, including the closing agent's "[f]ailure to * * * comply with any applicable written closing instructions, when agreed to by [U.S. Title]." Horejs, a representative from Chicago Title, explained that settlement funds are "accounted for in the closing of that particular transaction, funds coming in, funds going out. * * * [S]ettlement is another term for escrow or closing[; they] all mean[] the same thing." Horejs agreed to the statement that "if there is no loss of closing funds, escrow funds, settlement fund[s]," Chicago Title has no liability under the closing protection coverage.

{¶ 16} U.S. Title provided Johnson with a copy of the owner's policy of title insurance that Chicago Title issued for the loan and mortgage, which Wachter had verbally requested. The policy required that Johnson notify Chicago Title of a claim

by submitting a written statement to a P.O. Box address in Jacksonville, Florida. The owner's policy insured Johnson against loss or damage from certain covered risks arising before the June 2, 2010 policy date, including "[a]ny defect in or lien or encumbrance on the Title[.]" Johnson's owner's policy also contained exclusions:

> The following matters are expressly excluded from the coverage of this policy, and the Company will pay not loss or damage, costs or attorneys' fees, or expenses that arise by reason of:
>
> * * *
> 3.      Defects, liens, encumbrances, adverse claims, or other matters:
>
>> (a) created, suffered, assumed, or agreed to by the Insured Claimant;
> * * *
>
>> (d) attaching or created subsequent to Date of Policy[.]

The owner's policy also included a standard mechanic's lien exception:

> This policy does not insure against loss or damage (and the Company will not pay costs attorneys' fees or expenses) which arise by reason of * * * [a]ny lien, or right to a lien, for services, labor or material heretofore or hereafter furnished, imposed by law and not shown by the public records.

{¶ 17} Wachter testified that he did not tell Gerome that any specific provision should be removed from the owner's policy. Horejs testified that the closing instructions would "never" instruct the issuing agent to delete a mechanic's lien exception from the owner's policy. He explained that

> In a situation where there is a current owner of the property, in other words, they are not a new purchaser coming into a new property, they are the existing owner who has owned and controlled the property and anything done on it, there would be no reason or purpose to delete the mechanic's lien exception because the — any work done on the property

by the owner would not be a covered matter. It is excluded from coverage as a matter created and assumed by that insured.

{¶ 18} Horejs testified that the standard exception for mechanic's liens in Johnson's owner's policy "wouldn't make any difference" with respect to liens related to work that began after the policy date "because it would be a subsequent matter, a post-policy matter outside the title policy." Horejs explained that a title insurance company in Ohio cannot offer insurance for post-policy events: "It just simply is not part of the coverage that has been approved by the Department of Insurance and it's not — there isn't any forum in the industry that would do that."

{¶ 19} Horejs further testified that the exclusion set forth in section 3(a) of the owner's policy would exclude coverage related to mechanic's liens that were created by the insured not paying a contractor, regardless of the reason for nonpayment:

> If an owner has work performed on the property, in other words, they hire a builder, they hire a contractor to do some work on the property, they are creating a situation themselves which, should they not pay that contractor for any reason, regardless of merit, and it results in a lien on the property, the lien is the result of the owner's own action. * * * There are other legal avenues that an owner can pursue if there is that kind of dispute [over the quality of the contractor's work], but from the limited standpoint of a title insurance policy, a policy cannot insure an owner from their own acts. It's one of the — it's one of the fundamental distinctions of title insurance from other forms of insurance.

{¶ 20} U.S. Title also provided KeyBank with a copy of the lender's policy of title insurance issued by Chicago Title for the loan and mortgage.[1] The lender's

---

[1] KeyBank never brought a claim against appellees pursuant to KeyBank's lender's policy.

policy stated that KeyBank was insured "as of Date of Policy," but it did not contain the standard mechanic's lien exception.

{¶ 21} On June 14, 2010, Berns began construction at Johnson's property. Pursuant to his loan agreement with KeyBank, Johnson requested disbursements to pay the contractors on August 2, 2010 ($86,264.98) and August 27, 2010 ($65,454.03). KeyBank approved these requests and disbursed the funds to Johnson.

{¶ 22} On October 15, 2010, Johnson terminated Berns after disputes over construction performance. Berns claimed that Johnson owed payment for work performed, and Johnson disagreed. On October 29, 2010, Berns recorded a mechanic's lien on Johnson's property for $241,521.95.[2] Berns also pursued mandatory arbitration against Johnson for breach of contract. The arbitrator found that Johnson breached the contract with Berns by failing to pay for certain work performed and by preventing Berns and the subcontractors from further performing. The arbitrator awarded Berns $166,550.00, which Berns converted to a judgment lien. *See Berns Custom Homes, Inc. v. Johnson*, Cuyahoga C.P. No. CV-12-791858, *aff'd, Berns Custom Homes, Inc. v. Johnson*, 8th Dist. Cuyahoga Nos. 100837 and 101014, 2014-Ohio-3918. Johnson never paid anything to satisfy the judgment. Berns's lien remained on Johnson's property until it expired in 2016. Johnson incurred over $468,000.00 in legal fees from his arbitration with Berns.

---

[2] Four subcontractors also filed mechanic's liens totaling $55,669 in the fall of 2010. These liens were later released.

{¶ 23} On December 3, 2010, Johnson hired Korner Construction, with KeyBank's approval, to resume the renovations. On December 22, 2010, KeyBank disbursed $61,000.00 in response to Johnson's third draw request. Johnson submitted two additional disbursement requests in December, which triggered title searches. On December 29, 2010, U.S. Title notified KeyBank of Berns's lien on the property, and KeyBank denied Johnson's outstanding draw requests.

{¶ 24} Between December 31, 2010, and January 17, 2011, Johnson and Wachter corresponded with U.S. Title to request removal of Berns's lien pursuant to Johnson's closing protection coverage and owner's policy, asserting that Johnson was a third-party beneficiary of KeyBank's lender's policy. U.S. Title did not respond. Johnson and KeyBank also asked U.S. Title to "insure through" Berns's lien, to continue to insure KeyBank for future advances to Johnson as if Berns's lien did not exist. U.S. Title declined to do so.

{¶ 25} Johnson did not correspond directly with Chicago Title. He admitted that he never sent notice to them to the P.O. Box address in Jacksonville, Florida, as required by his owner's policy. Horejs testified that Chicago Title never received a claim under the closing protection from either KeyBank or Johnson. Horejs further agreed that U.S. Title was not "authorized to accept on behalf of Chicago Title a notice of claim made by an insured."

{¶ 26} Although Berns's lien was not removed from Johnson's property (until it expired in 2016), KeyBank ultimately continued to disburse the remaining funds. Johnson was asked on cross-examination, "So, a contractor's consent

provision was never signed by Berns? Never any insurance over the mechanic's lien, but KeyBank issued another draw payment to you in January of 2011 in the amount of $115,280.40, didn't they?" Johnson replied that he did not remember getting a payment in January 2011. But he later admitted that in his amended complaint, he stated, "In January 2011, KeyBank honored the previously dishonored draw request made in December 2010."

{¶ 27} KeyBank also disbursed $100,000.00 in July 2011. By August 2011, KeyBank had disbursed all loan funds except for $35,000.00, which it held until construction was completed pursuant to a holdback agreement with Johnson. By 2013, Korner Construction had completed the renovations, KeyBank had disbursed the full amount of the loan, and the loan converted to permanent financing.

{¶ 28} Despite the disbursements from KeyBank, Johnson testified that he funded the rest of the renovation himself and sought reimbursement from KeyBank. Johnson further testified that he continued to pay rent for his downtown Cleveland office because the completion of his home office was delayed by two years.

{¶ 29} At the close of Johnson's case in chief, appellees jointly moved for a directed verdict on all of Johnson's claims. The trial court took the arguments "under advisement" and had appellees present their cases. Appellees called Gerome and their expert witness, Michael Waiwood.

{¶ 30} Gerome explained that it would have been "impossible" for U.S. Title to have removed the mechanic's lien exclusion from Johnson's owner's policy. He stated, "You can't do that." He further explained that mechanic's lien exceptions are

"never deleted from the owner's policy" because "we do not insure things that people cause on their own." He testified that neither Johnson nor Wachter asked him specifically to delete the mechanic's lien exception from the owner's policy. Gerome also testified that U.S. Title is not authorized to accept claims on behalf of Chicago Title. He stated that he "probably [did] not" forward the emails he received from Johnson "purporting to make claims" to Chicago Title.

{¶ 31} Waiwood testified that he has been an attorney in the title insurance industry for almost 50 years. Throughout his career, he had been a branch manager at a title search company, vice president and regional underwriting counsel for a large multi-state title agency, president and CEO for one of the multi-state agency's subsidiary underwriting companies, and president and underwriting counsel for a national title company. He was also involved in regulatory work, writing statutes in Ohio.

{¶ 32} Waiwood opined that "the mechanic's liens are not a covered matter under the owner's policy." He explained:

> [A]nything that occurs in an owner's policy subsequent to the date of policy is simply not covered. In addition to that, there [are] exclusions in the policy form itself. An exclusion to the title insurance policy by statute, by law in Ohio, is these are matters that are not covered by title policies. And one of the exclusions in the policy clearly states that it doesn't cover any matters after the date of the policy.

{¶ 33} Waiwood explained that if the mechanic's lien exception had been deleted from Johnson's owner's policy, Berns's lien would still not be covered under the policy. He stated that "the policy does not cover any liens that become effective

or filed after the date of policy." When asked whether the mechanic's lien exception would make a difference as to whether Berns's lien would be covered, he answered "absolutely not. They're not covered. It's that simple. We are not a casualty insurer. We could only insure up to the date of policy by law."

{¶ 34} Waiwood further testified that the exclusion set forth in section 3(a) of Johnson's owner's policy would also preclude coverage of damages related to Berns's lien. He explained that the exclusion in section 3(a) addresses:

> a matter that is created, suffered, or assumed by the insurer. In other words, the responsibility is caused by the insured themselves. And our position on that would be if I was being asked to underwrite this, I would say that these mechanic's liens are by virtue of the fact that Mr. Johnson simply did not pay his contractors.

{¶ 35} In relation to the closing protection coverage, Waiwood testified that such coverage limits liability to a loss of settlement funds: settlement funds are "the only thing that [closing protection] cover[s]. And if there is no loss of settlement funds, then the issue of mechanic's liens is irrelevant." Waiwood stated that the closing protection coverage did not cover damages arising from Berns's lien because they are not settlement funds. Moreover, he explained the coverage included an exclusion that provides:

> [T]he company will not be liable for any loss [of closing funds] arising out of mechanic's and materialman's liens in connection with your purchase or lease, or consideration, or construction loan transaction. Except to the extent that that protection against such liens is afforded by a title insurance commitment or policy. * * * This form is not intended to be a substitute for a title insurance policy.

He further explained that the closing protection coverage would not apply to damages from Berns's lien because the coverage "basically excludes liability for any

matters that were created or caused by, or suffered, or assumed by the named party in the closing protection letter."

{¶ 36} After appellees rested, Johnson called a rebuttal expert witness, Robert Greggo. Greggo testified that he had been general counsel at a title agency for over 25 years, where his responsibilities included writing title insurance, reviewing the results of title examinations, handling underwriting decisions, and supervising the escrow process.

{¶ 37} Greggo disagreed with Waiwood's opinions that the owner's policy and closing protection coverage would not cover damages from Berns's lien. He testified that "it's very common" for mechanic's lien exceptions to be deleted from an owner's policy and opined that Johnson's owner's policy should have had the exception removed. He also explained that a title insurance policy can insure mechanic's liens filed after the closing date "if the work on the project was performed prior to the effective date of the policy, the closing date." Greggo testified that the renovation began in "2009 or earlier in 2010" with a prior contractor, and the lien Berns filed on Johnson's property dates back to the date the prior contractor first started to work on the renovations on Johnson's house. "In my opinion, it was one continuous project." Greggo admitted that he did not know that Johnson had executed an affidavit that stated he had fully paid the previous contractor in September 2009.

{¶ 38} Greggo also disagreed with Waiwood's opinion on closing protection coverage because he said that the coverage "protected [Johnson] against failure to

follow closing instructions," and U.S. Title failed to follow the closing instructions because it issued Johnson an owner's policy that included the mechanic's lien exception. Greggo testified that the closing instructions applied to Johnson's owner's policy based on Johnson's and Wachter's oral instructions to U.S. Title. But he admitted that liability under the closing protection coverage would have to be based on failure to follow any "written" closing instructions. Greggo also testified that he didn't "believe there were any" losses of settlement funds.

{¶ 39} After Greggo testified, appellees renewed their motion for directed verdict. The trial court again took their arguments "under advisement" and charged the jury. The trial court went through each of Johnson's claims with the jury and instructed them on the relevant law. The parties then presented their closing arguments.

{¶ 40} Sometime thereafter, off the record, the trial court granted U.S. Title's motion for directed verdict on Johnson's negligence claim. The trial court read the verdict forms and interrogatories to the jury and without explanation instructed the jury to "rip up" the verdict form for Count 4, negligence. The trial court released the jury for deliberations and submitted the written charge, jury interrogatories, and jury verdict forms to them.

{¶ 41} After deliberating, the jury found in favor of appellees on Johnson's breach-of-contract and specific-performance claims against both U.S. Title and Chicago Title, and Johnson's breach of fiduciary duty claim against U.S. Title. In response to Jury Interrogatory No. 2, "Do you find by the greater weight of the

evidence that any defect, lien, or encumbrance existed on the plaintiff's title to the property as of June 2, 2010 other than the KeyBank [m]ortgage," the jury responded "NO." In response to Jury Interrogatory No. 13, "Do you find by the greater weight of the evidence that U.S. Title failed to follow written closing instructions[,]" the jury responded "NO." The trial court subsequently dismissed Johnson's claim for bad faith as a matter of law. Johnson moved for a new trial based on cumulative errors, which the trial court denied without explanation.

{¶ 42} Johnson now appeals the trial court's actions during trial as well as the trial court's bifurcation of his bad-faith claim, grant of the directed verdict on his negligence claim, and denial of his motion for a new trial.

## II. Law and Analysis

### A. Law of the Case

{¶ 43} In his first assignment of error, Johnson argues that the trial court erred by failing to comply with the "law of the case" created by this court in *Johnson*, 2017-Ohio-2852, 91 N.E.3d 76. He maintains that our decision "set out a clear mandate to be followed, which the trial court disregarded." Specifically, he claims that this court created law of the case with respect to the following issues:

1. Johnson is entitled to insurance coverage for losses arising out of mechanic's liens because U.S. Title did not comply with the closing instructions;

2. Berns's signature on the consent clause should have been obtained and would have protected the priority of KeyBank's mortgage;

3. An escrow agent owes a fiduciary duty to both parties;

4. An insurance agent has a duty to exercise ordinary care and is negligent when it fails to procure requested insurance; and

5. Johnson is a third-party beneficiary of the closing instructions.

**{¶ 44}** We review de novo whether the law-of-the-case doctrine applies. *Frazier v. Rodgers Builders*, 8th Dist. Cuyahoga No. 91987, 2010-Ohio-3058, ¶ 60.

**{¶ 45}** Under the law-of-the-case doctrine, "the decision of a reviewing court in a case remains the law of that case on the legal questions involved for all subsequent proceedings in the case at both the trial and reviewing levels." *Nolan v. Nolan*, 11 Ohio St.3d 1, 3-4, 462 N.E.2d 410 (1984). The goals of the doctrine are "to ensure consistency of results in a case, to avoid endless litigation by settling the issues, and to preserve the structure of the superior and inferior courts as designed by the Ohio Constitution." *Estate of Mikulski v. Centerior Energy Corp.*, 2019-Ohio-983, 133 N.E.3d 899, ¶ 35 (8th Dist.), citing *Hawley v. Ritley*, 35 Ohio St.3d 157, 160, 519 N.E.2d 390 (1988). The doctrine "'compel[s] trial courts to follow the mandates of reviewing courts[,]' and trial courts are 'without authority to extend or vary the mandate given.'" *Id.*, quoting *Hawley* at 160. Where a trial court following remand "'is confronted with substantially the same facts and issues as were involved in the prior appeal, the court is bound to adhere to the appellate court's determination.'" *Id.*, quoting *Hawley* at 160. The law-of-the-case doctrine applies only to legal issues "that have been decided with finality." *Williams v. Matthews*, 8th Dist. Cuyahoga No. 103501, 2016-Ohio-3461, ¶ 7. However, the law of the case

"is considered to be a rule of practice rather than a binding rule of substantive law and will not be applied so as to achieve unjust results." *Nolan* at 3.

{¶ 46} Appellees argue that this court's decision in *Johnson*, 2017-Ohio-2852, 91 N.E.3d 76, did not create law of the case because this court applied the summary-judgment standard, construed the evidence most strongly in favor of Johnson, and determined that genuine issues of material fact existed on all counts. However, even appellate decisions that reverse a grant of summary judgment and remand for the resolution of factual issues can create law of the case if they also make a legal determination. *See Hubbard ex rel. Creed v. Sauline*, 74 Ohio St.3d 402, 659 N.E.2d 781 (1996) (legal finding in opinion reversing grant of summary judgment created law of the case); *Hopkins v. Dyer*, 104 Ohio St.3d 461, 2004-Ohio-6769, 820 N.E.2d 329 (same). Therefore, if we resolved a question of law in *Johnson*, 2017-Ohio-2852, 91 N.E.3d 76, we created law of the case on that question.

{¶ 47} We reject Johnson's argument that we created law of the case for four out of his five propositions. First, to support his assertion that we mandated that Johnson should have been covered for losses stemming from Berns's lien because his owner's policy should not have included a mechanic's lien exclusion and U.S. Title failed to comply with the closing instructions, Johnson cites to footnote 11 and paragraphs 73 and 74 of *Johnson*, 2017-Ohio-2852, 91 N.E.3d 76. In these paragraphs, however, this court found that there were genuine issues of material fact regarding these issues. We did not make a legal determination or create law of the case. Indeed, we concluded that Johnson's entitlement to a mechanic's lien

exclusion and appellees' liability under the owner's policy and closing protection coverage were questions of fact to be determined on remand. *Id.* at ¶ 74.

{¶ 48} Second, to support his claim that we created law of the case that Berns's signature on the consent clause should have been obtained and would have protected the priority of KeyBank's mortgage, Johnson cites to paragraphs 64 and 74 of *Johnson*, 2017-Ohio-2852, 91 N.E.3d 76. Again, in these paragraphs, we did not make legal determinations or create law of the case. Paragraph 64 merely describes the closing instructions and states that by including the consent clause, it "indicates a clear expectation that it should have been signed." But this statement is not a legal determination that the consent clause should have been signed. In conjunction with paragraph 74, we simply concluded that there was a question of fact as to whether U.S. Title failed to comply with the closing instructions, which stated that "[a]ll documents are to be executed[.]"

{¶ 49} Finally, to support his argument that we created law of the case that (1) an escrow agent owes a fiduciary duty to both parties, and (2) an insurance agent has a duty to exercise ordinary care, and is negligent when it fails to procure requested insurance, Johnson cites to paragraphs 45, 77, 80, and 81 of *Johnson*, 2017-Ohio-2852, 91 N.E.3d 76. The first three paragraphs are mostly block quotes from other cases setting forth black-letter law on an escrow agent's duty, an insurance agent's duty, and a fiduciary duty. And we concluded in paragraph 81 that "[t]he issues of bad faith, negligence, and ordinary care will be addressed upon

remand, based on our findings herein." Therefore, we did not make legal determinations on these issues or create law of the case in these paragraphs.

{¶ 50} Johnson's final argument is that we created law of the case that he was a third-party beneficiary to the closing instructions. Based upon this court's determination that he was a third-party beneficiary, he argues that "any evidence that [he] was not a party to the [c]losing [i]nstructions, or that he could not recover for a breach of those instructions, is contrary to [our] [d]ecision." He sets forth multiple examples of where he claims the trial court allowed improper evidence that he was not a party to the closing instructions and asserts that he was prejudiced by such error.

{¶ 51} This court did conclude that Johnson had standing to pursue a breach of contract claim because he was a third-party beneficiary to the closing instructions. *See Johnson* at ¶ 66. But even assuming arguendo that the trial court erred in allowing appellees to present evidence that he was not a party to the closing instructions, any error would be harmless because the jury found that U.S. Title did not breach the closing instructions. In response to Jury Interrogatory No. 13, "Do you find by the greater weight of the evidence that U.S. Title failed to follow written closing instructions[,]" the jury responded "NO." This finding is significant because the closing instructions did not contain any instruction whatsoever requiring U.S. Title to issue an owner's policy — let alone with standard provisions omitted — or to obtain the signature of anyone other than Johnson on any of the closing documents. Further, any coverage afforded by the closing protection coverage is

expressly limited to the loss of closing funds that resulted from the closing agent's failure to follow the written closing instructions. The jury found that U.S. Title followed the closing instructions. Therefore, even if the trial court allowed evidence and argument inconsistent with Johnson being a third-party beneficiary to the closing instructions, the outcome of the trial would have been the same.

{¶ 52} Accordingly, we overrule Johnson's first assignment of error.

## B. Directed Verdict on Johnson's Negligence Claim

{¶ 53} In his second assignment of error, Johnson argues that the trial court erred in granting a directed verdict in favor of U.S. Title on Johnson's negligence claim. Specifically, Johnson claims that U.S. Title was negligent by not issuing a title insurance policy with the standard mechanic's lien exceptions removed and not obtaining Berns's signature on the Consent Clause.[3]

{¶ 54} We review the trial court's decision to grant a directed verdict de novo. *Taylor-Stephens v. Rite Aid of Ohio*, 8th Dist. Cuyahoga No. 106324, 2018-Ohio-4714, ¶ 53. Civ.R. 50 provides:

> When a motion for directed verdict has been properly made, and the trial court, after construing the evidence most strongly in favor of the party against whom the motion is directed, finds that upon any determinative issue reasonable minds could come to but one conclusion upon the evidence submitted and that conclusion is adverse to such party, the court shall sustain the motion and direct a verdict for the moving party as to that issue.

---

[3] Johnson states that the trial court suggested in chambers that Johnson could not bring claims both for negligence and breach of fiduciary duty because they have two different standards of care. Because we review the grant of the directed verdict de novo, we do not consider the trial court's reasoning, and we never consider a trial court's comments that are not in the record.

{¶ 55} The Ohio Supreme Court has made clear that "the court must neither consider the weight of the evidence nor the credibility of the witnesses in disposing of a directed verdict motion." *Strother v. Hutchinson*, 67 Ohio St.2d 282, 284, 423 N.E.2d 467 (1981). "[I]f there is substantial competent evidence to support the party against whom the motion is made, upon which evidence reasonable minds might reach different conclusions, the motion must be denied." *Ruta v. Breckenridge-Remy Co.*, 69 Ohio St. 2d 66, 68-69, 430 N.E.2d 935 (1982). But "when the party opposing the motion has failed to produce any evidence on one or more of the essential elements of a claim, a directed verdict is appropriate." *Sivinski v. Kelley*, 8th Dist. Cuyahoga No. 94296, 2011-Ohio-2145, ¶ 20. "The essential elements of any negligence action are a duty of care, a breach of that duty, and an injury directly and proximately resulting therefrom." *Meyer v. Rapacz*, 8th Dist. Cuyahoga No. 95571, 2011-Ohio-2537, ¶ 17.

{¶ 56} Generally, the duty element in a negligence action is a question of law for the court to determine. *Wallace v. Ohio DOC*, 96 Ohio St.3d 266, 2002-Ohio-4210, 773 N.E.2d 1018, ¶ 22, citing *Mussivand v. David*, 45 Ohio St.3d 314, 544 N.E.2d 265 (1989). It is well settled that an insurance agency owes its customers a duty to exercise good faith and reasonable diligence in procuring its customer's insurance coverage. *Slovak v. Adams*, 141 Ohio App.3d 838, 845, 753 N.E.2d 910 (6th Dist.2001), citing *Damon's Missouri, Inc. v. Davis*, 63 Ohio St.3d 605, 590 N.E.2d 254 (1992). We said as much in *Johnson*, 2017-Ohio-2852, 91 N.E.3d 76, ¶ 80. Nonetheless, to survive a directed verdict, Johnson still had to present evidence

of (1) breach of that duty, (2) that the breach proximately caused any harm that he experienced as a result of the breach, and (3) injury resulting from the breach. After review, we find that he did not.

**{¶ 57}** Johnson argues that U.S. Title breached its duty in procuring insurance for him because it failed to ensure that the mechanic's lien exception was removed and obtain Berns's signature on the consent clause in the loan agreement. In support of his argument that U.S. Title breached these duties, Johnson contends that he and his attorney instructed U.S. Title to issue him a policy with the same protections as KeyBank. He maintains that the closing instructions therefore applied to him, including the provision that U.S. Title must obtain a title insurance policy that does "not contain any exception or exclusion from coverage based on the existence or possibility of mechanic's liens."

**{¶ 58}** Johnson presented evidence that his attorney instructed U.S. Title's closing agent that Johnson "should get every bit of coverage that's being provided to the bank in favor of him." But the record also reflects that neither the closing instructions nor any party instructed U.S. Title to obtain Berns's signature on the consent clause. Therefore, Johnson presented evidence, when viewed in a light most favorable to him, that U.S. Title breached its duty to procure a policy with no mechanic's lien exceptions, but not that U.S. Title breached its duty when it did not obtain Berns's signature on the consent clause.

**{¶ 59}** To survive directed verdict regarding U.S. Title's alleged breach for failing to procure the proper insurance, however, Johnson still had to present

evidence that the alleged breach in failing to procure an insurance policy with no mechanic's lien exclusion was the proximate cause of any harm that he incurred. After review, we find that Johnson's evidence of causation, even when viewed in a light most favorable to him, was problematic because even if his owner's policy did not have the mechanic's lien exclusion, the policy would still not have covered damages arising from Berns's lien.

{¶ 60} In addition to the mechanic's lien exclusion, Johnson's owner's policy contained an exclusion that stated:

> The following matters are expressly excluded from the coverage of this policy, and the Company will pay not loss or damage, costs or attorneys [sic] fees, or expenses that arise by reason of * * * [d]efects, liens, encumbrances, adverse claims, or other matters * * * attaching or created subsequent to Date of Policy[.]

{¶ 61} Johnson claims that his alleged damages arise from Berns's mechanic's lien. Johnson's owner's policy was dated June 2, 2010. In Jury Interrogatory No. 2, the jury specifically found that no lien or encumbrance existed on the property as of June 2, 2010. Berns recorded his lien on Johnson's property on October 29, 2010, which was long *after* the date of his owner's policy. Thus, even if U.S. Title had removed the standard mechanic's lien exclusion, Johnson would not have been covered under the owner's policy for any losses resulting from Berns's lien. Therefore, U.S. Title's alleged breach of duty to procure an insurance policy for Johnson with no mechanic's lien exception did not cause Johnson any damages that arose from Berns's lien.

{¶ 62} Further, the closing protection coverage provided protection to Johnson if U.S. Title failed to follow the applicable written closing instructions. Even Johnson's expert, Greggo, agreed that a claim under the closing protection coverage must be based on the failure to follow *written* closing instructions. The evidence at trial established that the written closing instructions did not require U.S. Title to issue an owner's policy at all or require U.S. Title to obtain Berns's signature on the consent clause. Further, the jury found that U.S. Title followed the written closing instructions. Thus, any alleged breach on the part of U.S. Title in procuring improper closing protection coverage could not have caused damages to Johnson for losses resulting from Berns's lien. Therefore, the trial court did not err when it granted U.S. Title directed verdict on Johnson's negligence claim.

{¶ 63} Johnson further contends that the trial court's order granting U.S. Title directed verdict on his negligence claim was highly prejudicial and reflected the trial court's bias against him because the trial court did not grant the motion until after it instructed the jury on negligence. Johnson maintains that the timing implied to the jury that Johnson could not prove his negligence claim, which then undermined Johnson's claims for breach of fiduciary duty and breach of contract. Because Johnson's counsel had just told the jury in closing argument that there was sufficient evidence to prove a negligence claim, Johnson also contends that the trial court's subsequent grant of the directed verdict undercut the credibility of Johnson's counsel. We disagree. While the timing of the trial court's order granting the directed verdict was unusual, closing arguments are not evidence. *Torres v.*

*Concrete Designs, Inc.*, 2019-Ohio-1342, 134 N.E.3d 903, ¶ 18 (8th Dist.).  The trial court here instructed the jury that "[t]he evidence does not include the pleadings or any statement of counsel made during the trial[.] * * * [T]he opening statements and closing arguments of counsel are designed to assist you and are not evidence."  We must presume that the jury followed the trial court's proper instructions.  *Id.*  Moreover, the jury heard extensive closing arguments, and negligence was a relatively small part.  Likewise, there were numerous jury instructions, and negligence was also a small part of them.  Therefore, after review, we find that Johnson was not prejudiced by the timing of the trial court's ruling on U.S. Title's motion for directed verdict, nor do we find that it reflects any bias against him.

{¶ 64} Accordingly, we overrule Johnson's second assignment of error.

### C. Bifurcation of Bad-Faith Claim

{¶ 65} In his third assignment of error, Johnson argues that the trial court erred by bifurcating the entirety of his bad-faith claim instead of just the punitive-damages evidence.

{¶ 66} In his amended complaint, Johnson alleged that appellees breached their duty of good faith and fair dealing by failing to acknowledge receipt of and paying Johnson's title insurance claim.  However, Johnson did not oppose U.S. Title's motion, filed over seven months before trial, to "bifurcate [Johnson's] bad faith and punitive damages claims at trial" pursuant to both R.C. 2315.21(B) and Civ.R. 42, and he did not timely object to the trial court's decision to grant the

motion.[4]  We therefore review this assignment of error for plain error.  *Goldfuss v. Davidson*, 79 Ohio St.3d 116, 121, 679 N.E.2d 1099 (1997).  Plain errors are those that prejudice the appellant and that "are clearly apparent on the face of the record." *Wells Fargo Bank, N.A. v. Lundeen*, 8th Dist. Cuyahoga No. 107184, 2020-Ohio-28, ¶ 12.  Courts reviewing plain error in civil cases "must proceed with the utmost caution."  *Risner v. Ohio Dept. of Natural Resources*, 144 Ohio St.3d 278, 2015-Ohio-3731, 42 N.E.3d 718, ¶ 27.

{¶ 67} We find no error here, plain or otherwise.  R.C. 2315.21(B) requires trial courts to bifurcate compensatory and punitive damages in tort actions "upon the motion of either party," and Civ.R. 42(B) gives trial courts discretion to order a separate trial on any claim or issue when bifurcation would "promote convenience, avoid prejudice, or when it would be economically prudent or efficient to do so." *Flynn v. Fairview Village Retirement Community, Ltd.*, 8th Dist. Cuyahoga No. 95695, 2013-Ohio-569, ¶ 4, fn. 1; *Havel v. Villa St. Joseph*, 131 Ohio St.3d 235, 2012-Ohio-552, 963 N.E.2d 1270, ¶ 26.  When they conflict, R.C. 2315.21(B) trumps Civ.R. 42(B).  *Havel* at ¶ 36.

{¶ 68} Here, the statute and the civil rule do not conflict, and the trial court had discretion to bifurcate the entirety of Johnson's claim for bad faith.  The trial court granted U.S. Title's motion to bifurcate, which specifically sought to "bifurcate Plaintiff's claim for bad faith under Count VI of the Amended Complaint and for

---

[4] Although during trial Johnson's counsel stated "for the record, in the plaintiff's view, [] the independent tort of bad faith should be in our case in chief," this statement came over seven months after the trial court granted the unopposed motion to bifurcate.

punitive damages." The bifurcation of bad-faith evidence promoted convenience and efficiency and avoided prejudice because the jury could not find bad faith without first finding liability on Johnson's other tort and contract claims. The trial court complied with R.C. 2315.21(B) by bifurcating the issue of punitive damages to a second phase of trial, and the trial court exercised its discretion pursuant to Civ.R. 42(B) to also bifurcate the liability portion of Johnson's bad-faith claim.

{¶ 69} Accordingly, we overrule Johnson's third assignment of error.

## D. The Trial Court's Management of the Proceedings

{¶ 70} In Johnson's fourth, fifth, and sixth assignments of error, he challenges the trial court's management of the trial proceedings. In his fourth assignment of error, Johnson argues that the trial court erred in denying his motion for a new trial because the trial court imposed inappropriate time restrictions, improperly excluded evidence, and submitted jury interrogatories that did not address a determinative issue and likely confused the jury. In his fifth assignment of error, Johnson argues that the trial court erred by excluding portions of Ed Horejs's video testimony. In his sixth and final assignment of error, he argues that the trial court was biased against him and in favor of appellees.

{¶ 71} Trial courts have broad discretion to "control the flow of trial." *Ridley v. Fed. Express*, 8th Dist. Cuyahoga No. 82904, 2004-Ohio-2543, ¶ 45. We review the imposition of time limits, the exclusion of evidence, the submission of jury interrogatories, and the control of witness examinations for abuse of discretion. *See State v. Kay*, 12 Ohio App.2d 38, 49-50, 230 N.E.2d 652 (8th Dist.1967) (time limits

for counsel's arguments are within the "sound discretion" of the trial court); *Fisher v. Fisher*, 8th Dist. Cuyahoga No. 95821, 2011-Ohio-5251, ¶ 5 ("The trial court's discretion to admit or exclude evidence is broad"); *Marketing Assocs.*, 8th Dist. Cuyahoga No. 92292, 2010-Ohio-59, at ¶ 49 (Civ.R. 49 gives trial courts discretion to review and approve jury interrogatories); *Weiner v. Kwiat*, 2d Dist. Montgomery No. 19289, 2003-Ohio-3409, ¶ 16 (trial courts have discretion to control redirect-examination); *State v. Treesh*, 90 Ohio St.3d 460, 480, 739 N.E.2d 749 (2001), quoting *State v. Acre*, 6 Ohio St.3d 140, 451 N.E.2d 802 (1983) ("'The limitation of * * * cross-examination lies within the sound discretion of the trial court, viewed in relation to the particular facts of the case. Such exercise of discretion will not be disturbed absent a clear showing of an abuse of discretion.'").

{¶ 72} As previously discussed, an abuse of discretion occurs when the trial court's attitude is unreasonable, arbitrary, or unconscionable. *Marketing Assocs.* at ¶ 47. "Appellate courts should defer to trial judges, who witnessed the trial firsthand and relied upon more than a cold record to justify a decision." *Harris v. Mt. Sinai Med. Ctr.*, 116 Ohio St.3d 139, 2007-Ohio-5587, 876 N.E.2d 1201, ¶ 36.

### 1. Motion for a New Trial

{¶ 73} In his fourth assignment of error, Johnson contends that the cumulation of errors deprived him of a fair trial. Under the cumulative-error doctrine, a judgment can be reversed when the cumulation of errors prevents a fair trial even if each individual error alone does not justify reversal. *Daniels v. Northcoast Anesthesia Providers, Inc.*, 8th Dist. Cuyahoga No. 105125, 2018-Ohio-

3562, ¶ 66.  Under Civ.R. 59(A), a court may grant a new trial based on "[i]rregularity in the proceedings of the court, jury, magistrate, or prevailing party, or any order of the court or magistrate, or abuse of discretion, by which an aggrieved party was prevented from having a fair trial"; "misconduct of the jury or prevailing party"; a judgment "not sustained by the weight of the evidence"; a judgment "contrary to law"; "[e]rror of law occurring at the trial and brought to the attention of the trial court by the party making the application"; and the trial court's "sound discretion * * * for good cause shown."  *Id.*  "Civ.R. 59(A) is meant to preserve 'the integrity of the judicial system when the presence of serious irregularities in a proceeding could have a material adverse effect on the character of and public confidence in judicial proceedings.'"  *Taylor-Stephens*, 8th Dist. Cuyahoga No. 106324, 2018-Ohio-4714, at ¶ 24, quoting *Wright v. Suzuki Motor Corp.*, 4th Dist. Meigs Nos. 03CA2, 03CA3, and 03CA4, 2005-Ohio-3494, ¶ 114.  Motions for a new trial "are not to be granted lightly."  *State v. Jerido*, 8th Dist. Cuyahoga No. 72327, 1998 Ohio App. LEXIS 730, 5 (Feb. 26, 1998).

{¶ 74} Johnson contends that the trial court prejudiced him by limiting his opening statement to twenty minutes, prohibiting his PowerPoint presentation, "and giving him ten minutes to adjust" after precluding his PowerPoint before giving a revised opening statement.  Johnson further argues that the trial court arbitrarily limited his counsel's time to (1) examine him on redirect, (2) cross-examine Chicago Title's expert, Waiwood, and (3) examine his rebuttal expert, Greggo.

{¶ 75} Johnson argues that the time restriction on his opening statement was arbitrary and prevented him from presenting key information "in a way that the jury could easily process and remember[.]" Johnson cites to *Yerrick v. E. Ohio Gas Co.*, 119 Ohio App. 220, 223, 198 N.E.2d 472 (9th Dist.1964), for the principle that "[c]ounsel is allowed a wide latitude in the presentation of his oral argument, even though he is at all such times under the supervision and control of the trial judge." This case is in the context of closing arguments as opposed to opening statements, but we do not disagree with this statement of law and emphasize the "supervision and control of the trial judge." "The purpose of an opening statement is to inform the jury of the nature of the case and to outline the facts involved." *Thompson Aluminum Casting Co. v. Am. Mfrs. Mut. Ins. Co.*, 8th Dist. Cuyahoga No. 64977, 1994 Ohio App. LEXIS 1395, 16 (Mar. 31, 1994). The trial court, however, "has broad discretion to regulate the opening statement." *Riddle v. Butt*, 2d Dist. Clark No. 2993, 1994 Ohio App. LEXIS 481, 7 (Feb. 2, 1994) (trial court did not abuse its discretion in restricting time for and precluding use of photographs in opening statement).

{¶ 76} After review, we find that the trial court did not abuse its discretion in limiting opening statements and precluding Johnson's PowerPoint presentation. The trial court imposed similar time limits on all parties, not just Johnson. Chicago Title argues that Johnson's PowerPoint referred to evidence that the trial court excluded and that Johnson did not fully comply with the trial court's instructions to remove certain items from the presentation. Johnson disputes this allegation.

Exclusion for this reason would have been warranted. *See Ford v. Gooden*, 9th Dist. Summit No. 23779, 2007-Ohio-7043 (trial court did not err in precluding PowerPoint from opening statement where presentation included photographs that had been excluded from evidence). Regardless, the trial court's reasoning for preventing Johnson from using the PowerPoint is not in the record on appeal, and we see no indication that the trial court abused its broad discretion in regulating opening statements.

{¶ 77} In support of his argument that the trial court improperly limited his examinations of witnesses, Johnson points to three cases. First, in *Farmers Natl. Bank of Springfield v. Frazier*, 13 Ohio App. 245 (2d Dist.1920), the Second District held that the trial court abused its discretion by limiting the cross-examination of the plaintiff himself (one of only two witnesses in his case in chief) to six minutes. Second, in *Readnower v. Readnower*, 162 Ohio App. 3d 347, 349, 2005-Ohio-3661, 833 N.E.2d 752 (2d Dist.), the Second District held that the trial court abused its discretion by condensing a 2.5-hour hearing into 40 minutes because the court was "annoyed with the attorneys" for spending the hearing time negotiating. *Id.* Third, in *In re T.H.*, 192 Ohio App.3d 201, 2011-Ohio-248, 948 N.E.2d 524 (2d Dist.), the Second District held that the trial court erred by limiting a party's time to present his case in chief and prohibiting three witnesses from testifying because the trial court "clearly wanted to conclude the custody trial" that had been rescheduled many times due to the court's conflicts.

{¶ 78} These cases are distinguishable from the present case, and we find that the trial court did not abuse its discretion in limiting Johnson's examinations. The trial court gave Johnson's counsel plenty of warning that he was running out of time to conduct his redirect-examination of Johnson. The trial court asked Johnson's counsel to "move along" and "move on" numerous times and reminded him of the time. The trial court also gave the parties notice of the time restraints for Waiwood and Greggo: cross-examination of each was limited to 20 minutes, and Johnson's direct examination of Greggo was limited to 40 minutes. Unlike *Frazier* where the trial court limited the testimony of the primary witness, Waiwood and Greggo's testimony was relatively limited in scope, and Johnson himself spent a lot of time on the stand. Moreover, a review of the record does not demonstrate that the trial court limited witness examination because it was annoyed with the parties. Rather, the record shows that the trial court was concerned about the jury's attention span after sitting through many days of trial and extensive witness testimony. Finally, there is no evidence to suggest that the trial court was attempting to conclude the trial due to the court's own schedule.

{¶ 79} We also do not find that the time limits unduly prejudiced Johnson. Johnson argues that, given more time on his redirect-examination of Johnson, he could have introduced an email that referred to a letter that Johnson's counsel sent to Chicago Title in April 2012. He contends that this email would have shown that he timely notified Chicago Title of his claims. However, since the April 2012 letter was sent to Chicago Title a month after Johnson filed his amended complaint and

joined Chicago Title as a defendant in the case, it would not have been persuasive to show notice.

{¶ 80} Johnson also argues that given more time to cross-examine Waiwood and examine Greggo, he would have rebutted Waiwood's testimony that (1) Berns's lien was filed after Johnson's owner's policy and closing protection coverage were issued, (2) the mechanic's lien exception barred coverage under the owner's policy, and (3) the closing protection coverage covered only a loss of settlement funds. However, to rebut Waiwood's testimony that Berns's lien was filed after Johnson's owner's policy and closing protection coverage were issued, Johnson had obtained testimony from Greggo that Berns's lien should "relate back" to the start of Fyffe's construction because Berns's work was really a continuation of Fyffe's. Johnson likewise solicited testimony from Greggo that his owner's policy should not have included the mechanic's lien exception and that a failure to comply with closing instructions would have impacted coverage under the closing protection coverage. Therefore, if Johnson had more time to cross-examine Waiwood and examine Greggo, it would have been duplicative testimony.

{¶ 81} Next, Johnson argues that the trial court abused its discretion in excluding evidence of (1) damages from his arbitration with Berns, (2) Johnson's prehearing brief from the arbitration, and (3) communications that U.S. Title had with its professional liability insurer. Johnson contends that his arbitration prehearing brief references the lien Berns filed on Johnson's property, and that the brief would therefore have shown that the arbitration was directly related to the lien.

He argues that appellees should be liable for his arbitration expenses because had they complied with the closing instructions and their duty to defend, he would not have incurred the arbitration expenses. Johnson further argues that the evidence referencing U.S. Title's professional liability insurer would have demonstrated that Johnson had given Chicago Title notice of his claims.

{¶ 82} We find that any error the trial court may have made in excluding evidence of the expenses Johnson incurred through arbitration with Berns and the arbitration prehearing brief would not justify a new trial. The jury found for appellees on all counts and did not find that Johnson was entitled to any damages.

{¶ 83} Moreover, we find that the trial court did not abuse its discretion in excluding evidence of communications between U.S. Title and its professional liability insurer because such evidence is irrelevant. "Evidence which is not relevant is not admissible." Evid.R. 402. Evidence is relevant if it has "any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Evid.R. 401. We fail to see how communications between U.S. Title and its professional liability insurer would show that Johnson notified Chicago Title of his claims.

{¶ 84} Lastly, Johnson asserts that the trial court erred by submitting the following "highly prejudicial and inaccurate interrogatories" to the jury:

> Interrogatory Nos. 10: "Do you find by the greater weight of the evidence that Johnson gave written notice or statement of a claim under the Owner's policy of Title Insurance to Chicago Title Insurance Company, Attn. Claims Department, P.O. Box 45023, Jacksonville,

Florida 32232-5023? * * * at least six of the eight jurors must agree on the answer."

Interrogatory Nos. 19: "Do you find by the greater weight of the evidence that Johnson gave written notice or statement of a claim under the Closing Protection Letter to Chicago Title Insurance Company, Attn. Claims Department, P.O. Box 45023, Jacksonville, Florida 32232-5023? * * * at least six of the eight jurors must agree on the answer."

Johnson argues that these interrogatories suggested that an element of Johnson's claims for breach of contract included that he needed to send notice of his claims to the particular P.O. Box, which likely confused the jury.

**{¶ 85}** "Proper jury interrogatories must address determinative issues and must be based upon trial evidence." *Ramage v. Cent. Ohio Emergency Serv., Inc.*, 64 Ohio St.3d 97, 107, 592 N.E.2d 828 (1992). Civ.R. 49(B) provides,

The court shall submit written interrogatories to the jury, * * * upon request of any party prior to the commencement of argument. * * * The court shall inform counsel of its proposed action upon the requests prior to their arguments to the jury, but the interrogatories shall be submitted to the jury in the form that the court approves. The interrogatories may be directed to one or more determinative issues[,] whether issues of fact or mixed issues of fact and law.

**{¶ 86}** Interrogatories 10 and 19 addressed whether Chicago Title received notice of Johnson's claims, which was determinative of Chicago Title's defense to Johnson's claim for breach of contract against it. Interrogatories 10 and 19 were also based on trial evidence:

[Counsel for Chicago Title]:    Did you ever send notice to Chicago Title at a post office box in Jacksonville, Florida?

[Johnson]:    No.

{¶ 87} We therefore find that the trial court did not abuse its discretion in submitting Interrogatories 10 and 19 to the jury.

{¶ 88} We do not find any individual error to warrant a new trial, nor do we find the cumulation of errors to justify reversing the jury verdict. The trial court exercised its broad discretion to keep the trial moving and to avoid losing the jury's attention. While we understand Johnson's frustration with the trial court's management of the proceedings, we do not find that he was prevented from having a fair trial. Accordingly, we do not find grounds for a new trial pursuant to Civ.R. 59(A) and therefore overrule Johnson's fourth assignment of error.

## 2. Horejs's Video Testimony

{¶ 89} In his fifth assignment of error, Johnson argues that the trial court erred by excluding portions of Ed Horejs's video testimony. Ed Horejs is the vice president and regional counsel for Fidelity National Title Group, which consists of three title insurance companies, including Chicago Title. Horejs was unavailable for trial, and the trial court permitted Johnson to play portions of his video testimony. Johnson cross-examined Horejs for his case in chief. After U.S. Title examined Horejs, Johnson conducted recross-examination. Johnson contends that he was prejudiced when the trial court improperly and arbitrarily struck "substantial portions" of Horejs's video testimony.

{¶ 90} First, Johnson avers that the trial court improperly excluded his recross-examination of Horejs and that his recross-examination would have rebutted Horejs's testimony that "[1] the [c]losing [i]nstructions were only

KeyBank's instructions, [2] there was no coverage for post-policy liens, and [3] a pending disbursement clause should have been used, among other things." The scope of Johnson's recross-examination exceeded that of U.S. Title's examination of Horejs, and we do not find that the trial court abused its discretion in excluding it. Nor did the exclusion of the recross-examination unduly prejudice Johnson. After reviewing the transcript of Johnson's recross-examination, we do not identify testimony that would rebut that the closing instructions were KeyBank's instructions. Johnson's "rebuttal" of Horejs's testimony that there was no coverage for post-policy liens is merely confirmation that title insurance covered liens that existed before closing but do not manifest until after closing, to which Greggo also testified. Further, we find that Johnson's dialog with Horejs regarding pending disbursement clauses likely would have confused the jury. The dialog consisted of Johnson's attorney characterizing pending disbursement clauses and when they should be used, and Horejs disagreeing with the characterizations. It would not have rebutted Horejs's testimony.

{¶ 91} Second, Johnson argues that the trial court allowed some of Horejs's answers while striking his subsequent impeachment. We do not find that the trial court erred in excluding what Johnson characterizes as impeachment. Horejs testified that the contractor subordination clause would protect only KeyBank's first priority to the extent that the clause could have been enforced. Johnson then attempted to impeach Horejs with his prior testimony that the contractor's subordination would have protected KeyBank's mortgage. These two statements are

consistent with each other, and Johnson could not use the latter statement for impeachment.

{¶ 92} Third, the trial court excluded testimony about the agency agreement between appellees, and Johnson argues that Horejs testified that the agreement required U.S. Title to process claims and give notice to Chicago Title. We find that any error the trial court made in excluding this testimony is harmless because the agreement itself was admitted, and Gerome testified about it.

{¶ 93} Fourth, the trial court excluded testimony that (1) Horejs attended a mediation between Berns and Johnson, (2) knew that KeyBank and Johnson requested that Chicago Title insure through the lien, and (3) was included in correspondence that Johnson argues would have established that Chicago Title had notice of Johnson's claims. We do not find that the trial court abused its discretion in excluding this testimony because it does nothing to show that Johnson gave notice to Chicago Title in the manner that the closing protection letter required. Moreover, Horejs is included on only one of the letters, which was sent to him after Johnson filed this lawsuit.

{¶ 94} Fifth, the trial court excluded testimony that Horejs agreed with an article that an underwriter should meet with the borrower before closing to "break down confusing issues." Johnson contends that such testimony would have supported his argument that U.S. Title failed to carry out its duties. The article described best practices, not duties or actions that U.S. Title was required to follow.

We therefore find that the trial court did not abuse its discretion in excluding this testimony.

{¶ 95} Lastly, Johnson claims that the video was "choppy" and prevented the jury from observing Horejs's evasive responses. Because the video would have been disjointed regardless of what the trial court excluded, we do not find that the trial court abused its discretion.

{¶ 96} Accordingly, we overrule Johnson's fifth assignment of error.

### 3. Bias

{¶ 97} In his sixth and final assignment of error, Johnson argues that the trial court demonstrated bias against him and in favor of appellees. Johnson contends that the trial court "repeatedly undermined Johnson's position in front of the jury" by telling his counsel to "wrap it up" or "move on"; by interrupting and attempting to rephrase his counsel's questions; by interrupting the testimony of his witnesses and disagreeing with them; and by contradicting and chastising him, his counsel, and his witnesses "in a pervasive and prejudicial manner[.]"

{¶ 98} Johnson did not object to the judge's actions on which he now relies to demonstrate bias. We therefore must apply the plain error doctrine. *Goldfuss*, 79 Ohio St.3d at 121, 679 N.E.2d 1099.

{¶ 99} The Ohio Supreme Court has defined judicial bias as,

a hostile feeling or spirit of ill will or undue friendship or favoritism toward one of the litigants or his attorney, with the formation of a fixed anticipatory judgment on the part of the judge, as contradistinguished from an open state of mind which will be governed by the law and the facts.

*State v. Dean*, 127 Ohio St.3d 140, 2010-Ohio-5070, 937 N.E.2d 97, ¶ 48, quoting

*State ex rel. Pratt v. Weygandt*, 164 Ohio St. 463, 469, 132 N.E.2d 191 (1956).

{¶ 100} We have previously determined:

> If the trial judge forms an opinion based on facts introduced or events occurring during the course of the current or prior proceedings, this does not rise to the level of judicial bias, "unless [the opinions] display a deep-seated favoritism or antagonism that would make fair judgment impossible." *Dean*, ¶ 49, quoting *Liteky v. United States*, 510 U.S. 540, 555, 114 S.Ct. 1147, 127 L.Ed.2d 474 (1994). Accordingly, "judicial remarks [made] during the course of trial that are critical or disapproving of, or even hostile to, counsel, the parties, or their cases, ordinarily do not support a bias or partiality challenge." *Id.*, quoting *Liteky* at 555. In contrast, such remarks, "*may* [support a bias challenge] if they reveal an opinion that derives from an extrajudicial source; and they *will* [support a bias challenge] if they reveal such a high degree of favoritism or antagonism as to make fair judgment impossible." (Emphasis sic.) *Id.*, quoting *Liteky* at 555.

*State v. Hough*, 2013-Ohio-1543, 990 N.E.2d 653, ¶ 11 (8th Dist.) (holding that

judge's online post about race and the death penalty the same day as the defendant's

sentencing was not judicial bias); *see also State v. McCauley*, 8th Dist. Cuyahoga

No. 103681, 2016-Ohio-5411, ¶ 8 (citing *Hough* and finding trial judge's comment

that the criminal defendant "dodged a bullet" did not rise to the level of judicial bias).

{¶ 101} There is a presumption that "a judge is unbiased and unprejudiced in

matters over which he or she presides, and the appearance of bias or prejudice must

be compelling in order to overcome this presumption." *State v. Reese*, 8th Dist.

Cuyahoga No. 107714, 2019-Ohio-4670, ¶ 24. The Chief Justice of the Ohio

Supreme Court, or his or her designee, has the "exclusive jurisdiction to determine

a claim that a common pleas judge is biased or prejudiced." *Jones v. Billingham*,

105 Ohio App.3d 8, 11, 663 N.E.2d 657 (2d Dist.1995), citing Section 5(C), Article IV, Ohio Constitution. While appellate courts have no such authority, we can review biased comments for due-process violations. *Reese* at ¶ 24.

{¶ 102} The record does not reflect that the trial court acted with bias against Johnson. The trial court instructed all counsel to "move on," rephrased questions, and interrupted testimony of all counsel and witnesses, not just Johnson's. The trial court's interruption of both sides does not demonstrate bias against Johnson. *See State v. Cepec*, 149 Ohio St.3d 438, 2016-Ohio-8076, 75 N.E.3d 1185, ¶ 82 (finding no bias in part because the trial judge interrupted both sides a similar number of times and asked many witnesses questions).

{¶ 103} Moreover, the Ohio Rules of Evidence permit trial judges to question witnesses. Evid.R. 614(B) ("The court may interrogate witnesses, in an impartial manner, whether called by itself or by a party."). The testimony on which Johnson relies to show bias demonstrates that the trial court was attempting to keep the trial moving, ensure that attorneys laid a proper foundation for witnesses' testimony, and clarify confusing factual issues. Even though the trial court's management of the proceedings curtailed parts of Johnson's arguments and examinations, we do not find that the trial court "display[ed] a deep-seated favoritism or antagonism that would make fair judgment impossible." *Hough*, 2013-Ohio-1543, 990 N.E.2d 653, at ¶ 11.

{¶ 104} Accordingly, we overrule Johnson's sixth assignment of error.

{¶ 105} Judgments affirmed.

It is ordered that appellees recover from appellant costs herein taxed.

The court finds there were reasonable grounds for this appeal.

It is ordered that a special mandate be sent to said court to carry this judgment into execution.

A certified copy of this entry shall constitute the mandate pursuant to Rule 27 of the Rules of Appellate Procedure.

_____
MARY J. BOYLE, PRESIDING JUDGE

KATHLEEN ANN KEOUGH, J., and
RAYMOND C. HEADEN, J., CONCUR